**KELLEY COMPANY, INC., a Wisconsin corporation, Plaintiff,**

v.

**The CENTRAL NATIONAL INSURANCE COMPANY OF OMAHA, a Nebraska corporation, Defendant.**

**No. 84–C–664.**

United States District Court, E.D. Wisconsin.

June 3, 1987.

See also 598 F.Supp. 350.

Matthew J. Flynn, Quarles & Brady, Milwaukee, Wis., for plaintiff.

Ned J. Czajkowski, Kluwin, Dunphy & Hankin, Milwaukee, Wis., for defendant.

## DECISION AND ORDER

WARREN, Chief Judge.

### I. Background

The plaintiff, Kelley Company, Inc. is a Wisconsin corporation that manufactures mechanical and hydraulic dock boards, incinerators and other industrial products. The defendant, Central National Insurance Company of Omaha, is a Nebraska corporation. Defendant primarily provides excess insurance coverage.

In April of 1977, defendant issued to plaintiff an excess liability policy ("Central National Policy"). Pursuant to the policy, plaintiff was required to maintain primary insurance in the amount of $500,000. The Central National Policy was subject to a $250,000 deductible beyond the primary insurance level of $500,000.

On December 5, 1977, one Albert J. Bilotta, Jr. was injured in an industrial accident in Minnesota involving one of plaintiff's products. Mr. Bilotta brought an action against Kelley in Minnesota. The jury returned a verdict of 2.3 million dollars in favor of Bilotta of which it assigned Kelley 50% responsibility, or $1,150,000. Kelley appealed the judgment. The Minnesota Supreme Court reviewed the case and ordered a new trial only on the issue of liability.

Before the new trial, Kelley and its primary insurer entered into a settlement agreement with Bilotta whereby Kelley and its primary insurer would pay Bilotta $486,-942, and Bilotta agreed to satisfy the first $750,000 of liability against Kelley. The primary carrier, Kelley, and Central National were all involved or at least aware of settlement discussions.

Central National then negotiated a second settlement agreement. Central National agreed to pay Bilotta $312,820 in a structured settlement. This satisfied Kelley's and Central National's exposure up to $1,550,000. Central then demanded that Kelley pay the $250,000 deductible. Kelley argued that the $250,000 "credit" obtained from Bilotta in the first partial settlement was full satisfaction of the deductible.

Subsequently, Kelley filed this action seeking declaratory relief. Kelley seeks a declaration from the Court that it is not liable to Central National for the $250,000 deductible. Central National has counterclaimed alleging:

1. that Kelley breached its contract by failing to "actually pay" the deductible,

2. that Kelley owes Central $250,000 because Central paid this amount in Kelley's behalf, and

3. that Kelley damaged Central by settling with Bilotta in bad faith.

Cross motions for summary judgment have been filed and fully briefed.

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R. Civ.P. 56(c). In this case, the facts of what occurred are not in dispute; rather, the controversy centers on the legal importance of what occurred.

## II. Validity of the Release

■ Paragraphs one and two of the settlement agreement entered into between Bilotta, the primary carrier, and Kelley provided:

### AGREEMENT

1. That the defendant Kelley, and its primary insurer, American Home hereby agree to make payment to the Plaintiff of $486,942.00 in consideration of Plaintiff agreeing not to execute on the first $750,000.00 of any future verdict against Kelley.

2. Upon payment of the $486,942.00 paid on behalf of Kelley and American Home, its primary carrier, *said payment satisfies any liability of Kelley up to $750,000.00,* and the plaintiff agrees to satisfy any judgment that he may obtain against Defendant Kelley, up to $750,000.00, and further agrees not to execute against the defendant Kelley, unless or until, as a result of a verdict, the liability of the Defendant Kelley exceeds $750,000.00; and the Plaintiff further agrees to execute only for the amount that exceeds $750,000.00.

(emphasis added). Central argues that the $250,000 contained in the partial settlement agreement is only effective in the event there was a future verdict against Kelley

and does not apply here where there was no verdict. Although there is language in the agreement referring to any future verdict and judgment taken against Kelley, there is also language in the agreement which states that payment of the $486,942 "satisfies *any liability* of Kelley up to $750,000." The settlement agreement clearly provided that the first $750,000 of any claim that Bilotta had against Kelley was satisfied. Kelley faced potential liability in the amount of $2.3 million. Consequently, this Court is persuaded that the release is valid.

■ Central also argues that the release entered into between Bilotta, Kelley Co., and the primary carrier was a "Loy" type release and would not be recognized under Minnesota law. In *Loy v. Bunderson,* 107 Wis.2d 400, 320 N.W.2d 175 (1982), and *Teigen v. Jelco,* 124 Wis.2d 1, 367 N.W.2d 806 (1985), the Wisconsin Supreme Court held that an excess insurer has no claim against a primary insurer that settles a plaintiff's claim for less than the primary limits, while obtaining a satisfaction up to the primary carrier's policy limits.[1] Minnesota law on this issue is not as clearly stated. The Minnesota court has held that a primary carrier owes an excess carrier a duty of good faith in settlement negotiations to settle within policy limits. The court specifically stated:

When there is no excess insurer, the insured becomes his own excess insurer, and his single primary insurer owes him a duty of good faith in protecting him from excess judgment and personal liability. *If the insured purchases excess coverage, he in effect substitutes an excess insurer for himself. It follows that the excess insurer should assume the rights as well as the obligations of the insured in that position.*

*Continental Casualty Co. v. Reserve Insurance Co.,* 307 Minn. 5, 9, 238 N.W.2d 862, 864 (1976) (emphasis added). Additionally, the court listed the policy considerations underlying the insurance system:

1. For a discussion with particular emphasis on Wisconsin law see Comment, *Excess Insurer's Duty to Defend after Primary Insurer Settles*

*within Policy Limits: Wisconsin after Loy and Teigen* 70 Marq.L.Rev. 385 (1987).

First, when a primary insurer breaches its good faith duty to settle within policy limits, it imperils the public and judicial interests in fair and reasonable lawsuits.

Second, a contrary result in this case would permit an unfair distribution of losses among insurers. The insured has paid for two distinct types of coverage, undoubtedly at different rates because they involve different amounts and kinds of risks. Primary coverage is designed to cover liability from zero to certain policy limits (in this case $50,000); excess coverage is designed to cover liability only after those initial limits are exhausted. When a primary insurer refuses in bad faith to settle, it forces the excess insurer making a reasonable settlement to cover both primary and excess liability. Thus, the purposes of the different kinds of coverage and their rating structures are thwarted as the excess insurer bears the full loss and fulfills the primary insurer's duty to the insured, as well as its own. Whether on insurance—economics principles or general equitable principles, a party should not be made to bear a loss that rightfully belongs to another party.

*Id.* at 9–10, 238 N.W.2d at 864–65. Central argues, based on the above language, that Minnesota would not recognize the type of "Loy" release entered into by Kelley Company and the primary carrier.

The Minnesota Supreme Court, however, stated in a footnote in the *Reserve* case that the duty to pay a claim was distinguishable from duty to defend cases. *Id.* at 13–14 n. 9, 238 N.W.2d at 867 n. 9. *Reserve* involved the duty to pay a claim. The Court stated "that the insurer's duty to defend was an independent one that each insurer owed to its insured. The duty to pay a claim, however, is ... a joint duty owed by the insurers within their respective policy limits." *Id.*

Furthermore, in *Iowa National Mut. Ins. Co. v. Universal Under. Ins. Co.*, 276 Minn. 362, 150 N.W.2d 233 (1967), the Minnesota Supreme Court, decided the issue of whether an excess carrier could recover the expenses it incurred between the time it tendered defense until the time the primary carrier accepted the defense when there is a dispute as to liability between the carriers. After reviewing prior case law, the Court stated that "[t]he obligation to defend is a separate undertaking from the duty to provide coverage and pay a judgment." *Id.* at 367, 150 N.W.2d at 237. A primary insurer will not be held liable to the excess carrier for breach of its independent duty to defend. Kelley essentially became self-insured for the amount of the deductible, and thus, is in the analogous position of a primary insurer and should be able to enter into a settlement agreement.

Although Minnesota has not had the opportunity to review a "Loy" type release per se, based upon the distinction which Minnesota recognizes between the duty to pay and the duty to defend, this Court is persuaded that Minnesota would consider a "Loy" type release valid. As a result, this Court does not find it necessary to undertake a conflict of law analysis.

### III. Exhaustion of Coverage

Central also argues that Kelley cannot unilaterally modify the insurance contract terms by entering into a settlement. Central states that the insurance contract requires Kelley to actually pay the deductible to Central before Central's liability attaches. The pertinent parts of the policy provide as follows:

### INSURING AGREEMENTS

A. **Bodily Injury Liability.** The Company hereby agrees, subject to the terms and conditions hereinafter mentioned, to indemnify the Insured in respect to losses occurring during the policy period for any and all sums which the Insured shall by law become liable to pay and shall pay or by final judgment be adjudged to pay to any person or persons (excepting employees of the Insured during the course of their employment) as damages for bodily injuries accidentally sustained, including death at any time resulting therefrom, by reason of the Insured's operations as shown in Item 4 of the

Schedule and as more fully described in the underlying policy/ies issued to the Insured by the Primary Insurers, as shown in the Schedule.

Provided always that it is expressly agreed that liability shall attach to the Company only after the Primary Insurers have paid or have been held liable to pay the full amount of their respective ultimate net loss liability as shown in Item 4 of the Schedule, (hereinafter called the Primary Limits); and the Company shall then be liable to pay only such additional amounts shown in Item 4 of the Schedule.

## DEFINITIONS

2. **Ultimate Net Loss.** The words "ultimate net loss" shall be understood to mean the sums paid in settlement of losses for which the insured is liable after making deductions for all recoveries, salvages and other insurances (other than recoveries under the policy/ies of the Primary Insurers), whether recoverable or not, and shall exclude all expenses and "costs".

## CONDITIONS

3. **Attachment of Liability.** Liability under this policy shall not attach unless and until the Primary Insurers shall have admitted liability for the Primary Limit or Limits, or unless or until the Insured has by final judgment been adjudged to pay a sum which exceeds such Primary Limit or Limits.

4. **Maintenance of Primary Insurance.** This policy is subject to the same terms and conditions (except as regards the premium, the obligation to investigate and defend, the amount and limits of liability and the renewal agreement, if any, and except as otherwise provided herein) as are contained in or as may be added to the policy/ies of the Primary Insurers prior to the happening of a loss for which claim is made hereunder and should any alteration be made in the premium for the policy/ies of the Primary Insurers dur-

ing the currency of this Policy, then the Premium hereon shall be adjusted to pro rata.

9. **Cooperation.** In addition to the other provisions of this contract as respects cooperation, the Insured shall render such assistance as may be in its power in providing the Company with full information regarding any claim or suit under this policy, and will, when requested by the Company, undertake to obtain such information from the Primary Insurers, their agents or attorneys. The Company will reimburse the Insured for any expenses it may incur at the Company's request in complying with this section.

## DEDUCTIBLE ENDORSEMENT

It is hereby agreed that this policy is subject to a deductible in the amount of $250,000 in the aggregate applicable to *any* loss or losses, irrespective of number, *payable* under this policy.

It is further agreed that the deductible includes all expenses arising out of the payment or settlement of such loss or losses and all costs as defined elsewhere in this policy.

The policy is silent on whether or not the deductible is to be actually paid or whether a "credit" will be considered satisfaction of the deductible. In *Zeig v. Massachusetts Bonding & Ins. Co.*, 23 F.2d 665 (2nd Cir. 1928), the court held that an excess carrier was required to provide coverage even though the insured did not recover the entire amount covered by the primary policies and that excess insurance would not kick in until the primary policies had been "exhausted in the payment of claims to the full amount of the expressed limits." The court stated:

The claims are paid to the full amount of the policies, if they are settled and discharged, and the primary insurance is thereby exhausted. There is no need of interpreting the word "payment" as only relating to payment in cash. It often is used as meaning the satisfaction of a claim by compromise, or in other ways.

*Id.* at 666. The policy in this case does not state that actual payment is required. Central drafted the policy and could have inserted language to that effect, but it did not and as the Wisconsin Supreme Court stated, "[t]oo often the insurance companies come to the courts asking that the court supply the lacunae in their contracts." *Loy,* 107 Wis.2d at 428, 320 N.W.2d at 191. If there had been no deductible, Central would have been required to pay the entire amount of liability over $500,000, but because Kelley agreed to a $250,000 deductible, and Bilotta agreed to satisfy liability up to $750,000, Central should have begun negotiating a settlement at $750,000.

Central states that Bilotta did not view the settlement negotiations as starting at $750,000, but at $486,942. Central, however, could have gone to trial if it was not satisfied with the negotiations. Central apparently chose not to in view of the damage verdict. Central admits that it would have been unwise to go to trial. Central benefitted from the settlement. Moreover, Insurance policies are to be construed as a reasonable person in the position of the insured would understand it. *Garriguenc v. Love,* 67 Wis.2d 130, 134–35, 226 N.W.2d 414, 417 (1975). "[D]oubtful language in the policy must be construed most strongly against the insurer as the author of the policy." *Verlo v. Equitable Life Assur. Soc. of U.S.,* 562 F.2d 1034, 1036 (8th Cir. 1977) (diversity case applying Minn. law); *Harris v. Racine County,* 512 F.Supp. 1273 (E.D.Wis.1981); *Caledonia Community Hospital v. St. Paul Fire & Marine Ins. Co.,* 307 Minn. 352, 354–56, 239 N.W.2d 768, 770 (Minn.1976). This Court does not interpret the language in the policy to require actual payment of the deductible amount. The "credit" acted as an actual payment. When Central negotiated its settlement with Bilotta, it should have negotiated that its liability first began at $750,000. If it began negotiating about liability below $750,000, that was its mistake. Kelley cannot be responsible if Central did not begin negotiating at the level of its responsibility.

Recently, Central National submitted the case *United States Fire Ins. Co. v. Lay,* 577 F.2d 421 (7th Cir.1978), which involved a primary insurer who settled before a wrongful death action was filed. The primary insurer paid $70,000 of its $100,000 liability coverage to the administratrix. The administratrix released the primary insurer from any further liability. The excess insurer was not released. A wrongful death action was subsequently filed. Although the primary insurer had already settled out, it defended the action on behalf of the excess carrier. A settlement was then entered into and a judgment was entered in the amount of $150,000 with credit given to the primary insurer in the amount of $100,000. The excess insurer filed an action seeking a declaration that it was not liable for any part of the judgment. The district court and the Seventh Circuit held that the excess carrier was not liable based upon the policy language which required "that the excess carrier is liable only if and when the insured sustains a loss in excess of the retained limit of $100,000 by reason of liability imposed by law or assumed by contract." *Id.* at 423. The court found that insured did not sustain such loss because of the initial settlement; thus, there was no coverage. The Seventh Circuit further stated that it was "therefore immaterial whether, if there had been coverage, the underlying carrier would be considered to have 'paid the amount of retained limit.'" *Id.*

Kelley objected to the presentation of this case to the Court because of its untimeliness and its inapplicability. The submission of the case is untimely. The case should have been presented at the time the motions were filed. *Lay* was decided in 1978.

Furthermore, the case is not applicable to the facts of the present case. In this case, Kelley was facing potential liability of $2.3 million if the case had been retried. Secondly, Central was not represented by Kelley's primary carrier; Central was representing itself in negotiations and could have represented itself at trial if it did not settle the case. Furthermore, the Bilotta settlement agreement satisfied *any liabili-*

ty of Kelley up to $750,000. Kelley was potentially facing liability of $2.3 million. In *Lay,* liability was not even quantified. Additionally, the Central National Policy contains language which provides that excess liability attaches, when "the Primary Insurers shall have admitted liability for the Primary Limit or Limits...." By entering into the $750,000 settlement agreement with Bilotta, Kelley and the primary insurer admitted liability up to $750,000 thereby exhausting coverage. Finally and most importantly, the *Lay* policy contained specific language requiring payment of the retained limit; the Central policy contains no language regarding how the deductible should be paid.[2] Based upon the above reasons, this Court does not find that *Lay* is applicable to the present case.

## IV. Bad Faith

The next issue for the Court's review is whether Kelley engaged in bad faith by settling separately with Bilotta. The insurance contract provided as follows:

## CONDITIONS

4.  Insured Duties in the Event of Occurrence, Claim or Suit:

    (c) The insured shall cooperate with the company, and upon the company's request, *assist in making settlements,* in the conduct of suits and in enforcing any right of contribution or indemnity against any person or organization who may be liable to the insured because of injury or damage with respect to which insurance is afforded under this policy; and the insured shall attend hearings and trials and assist in securing and giving evidence and obtaining the attendance of witnesses. The insured shall not, except at his own cost, voluntarily make any payment, assume any obligation or incur any expense other than for first aid to others at the time of accident.

Central argues that there were contractual obligations requiring Kelley to cooperate. Central states that it is evident that Kelley Company's conduct in entering into the release with Bilotta and the primary carrier, ran contrary to the contractual obligations. Kelley argues that it is not bad faith for the primary carrier to settle out for its policy limits, and likewise, that it is not bad faith for a "self-insured" to settle out. Kelley considers the $250,000 deductible to be analagous to being self-insured, and therefore, they were free to negotiate a settlement with Bilotta for that amount.

This Court does not find that Kelley engaged in bad faith by settling its deductible amount with Bilotta separate from the settlement with Central. The $250,000 deductible is essentially self-insurance.[3] Kelley became a primary insurer for the amount of the deductible and Central became the excess carrier. As a primary insurer, it was free to settle its deductible amount. Central was aware of settlement negotiations; they were not done in secret. Central has not provided evidence that Kelley was requested and refused to assist in making a settlement as the language of the policy requires. It is not bad faith for an insured to satisfy its deductible by partial settlement with the injured.

Furthermore, Central states that if there had been a package settlement which covered both the primary and excess carrier's coverage, the case could have been settled for a lot less. Central bases this argument on a letter it received from the primary carrier stating that the case could probably be totally settled for $737,000. This was not an offer of settlement from the injured party. It was merely an estimate from the primary carrier regarding the possibility of a settlement figure. This can hardly account for evidence that the case could have been settled for $737,000.

Additionally, Central should not be heard to complain about the $312,820 settlement it entered into when it was facing a 2.3

2.  The Seventh Circuit also noted that Indiana law governed the case and that there were no Indiana authorities or authorities elsewhere on point. To the extent the *Lay* case relies upon Indiana law, it is inapplicable to the present case.

3.  *See* Note, *Insurance Settlement's: An Insured's Bad Faith,* 31 Drake L.Rev. 877 (1981–82).

million dollar jury verdict less the primary carrier's coverage and Kelley Co.'s deductible. Central is a large company and very familiar with settlements; it should have negotiated a better deal if it was not satisfied.

### V. Conclusion

Based upon the foregoing, the Court hereby GRANTS summary judgment to Kelley Co. and DENIES summary judgment to Central National.