1997-NMSC-041

945 P.2d 970

Kenneth RUMMEL, individually and as Assignee of Circle K, Inc., a Texas corporation, and as Assignee of ISLIC, Inc., an Illinois corporation, Plaintiff–Appellant,

v.

LEXINGTON INSURANCE COMPANY, a foreign corporation, Defendant–Appellee.

No. 22910.

Supreme Court of New Mexico.

Aug. 8, 1997.

Certiorari Denied Sept. 15, 1997.

Randi McGinn & Associates, P.A., Randi McGinn, Albuquerque, for Appellant.

Rodey, Dickason, Sloan, Akin & Robb, Mark C. Meiering, Albuquerque, for Appellee.

## OPINION

FRANCHINI, Chief Justice.

1. Kenneth Rummel sued Circle K Corporation for personal injuries and received a judgment for over $11 million in compensatory and punitive damages. Circle K held several insurance policies that provided personal injury coverage. Subsequently, Circle K and International Surplus Lines Insurance Company (ISLIC), one of its insurers, agreed to a settlement in which they were obliged to pay only a portion of their contractual liability and which allocated the compensatory and punitive damages among several of Circle K's insurers. Under the settlement, Lexington Insurance Company, which was not a party to the settlement, was expected to pay a portion of the compensatory damages. Rummel, as assignee of Circle K, sued Lexington, urging payment and alleging bad faith. Lexington moved for summary judgment, stating the settlement violated its contract with Circle K and alleging that the settlement negotiations were secretive, devious, and collusive. The trial court granted summary judgment in favor of Lexington.

2. We conclude, based upon principles of contract construction, that Lexington's insurance policy did not, as a matter of law, preclude the settlement. We also conclude that there are issues of material fact regarding the settlement negotiations. We remand so that Rummel and Lexington can present their respective bad faith allegations.

## I. FACTS

3. Kenneth Rummel was a clerk at a Circle K convenience store in Albuquerque. On May 6, 1987, acting in accordance with Circle K's policy of confronting shoplifters, he attempted to prevent three men from stealing a frozen pizza. The men beat him savagely, kicking him repeatedly in the face and head. Rummel suffered numerous broken facial bones and permanent brain damage. Rummel filed a lawsuit against Circle K, Inc. on July 11, 1989, seeking compensatory and punitive damages for his injuries.

4. In May 1990 Circle K and its affiliated companies filed petitions before the U.S. Bankruptcy Court in Arizona seeking reorganization under Chapter 11 of the Bankruptcy Code. In January of 1992, the bankruptcy court allowed Rummel to litigate his claims against Circle K by lifting the automatic stay that would otherwise have prevented him from pursuing his lawsuit.

5. A jury trial was held in October 1992. On October 30 the jury entered a verdict in Rummel's favor and awarded him $1,042,844.28 in compensatory damages and $10,700,000 in punitive damages. On November 20, 1992, the court entered its judgment, awarding to Rummel a total of $11,742,844.28 plus costs and interest. Circle K appealed. In the ensuing months, Rummel made several offers to settle.

6. At the time of the judgment, Circle K held numerous insurance policies, at least six of which covered damages for personal injury. The personal injury policies were "stacked," with each "layer" providing coverage after "lower" layers of coverage were expended. These policies were interrelated as follows:

Circle K's SIR: Circle K held a Self–Insured Retention (SIR) in which it personally assumed the risk of any claim from $1 through $250,000. This SIR was required by both Columbia Casualty Company and ISLIC, both of which provided insurance for amounts above $250,000.

Columbia Casualty Company agreed to indemnify Circle K for up to $750,000 of losses over and above the $250,000 SIR. The Columbia policy covered both compensatory and punitive damages.

ISLIC: International Surplus Lines Insurance Company agreed "to pay on behalf of" Circle K up to $5,000,000 of losses in excess of the $250,000 SIR.[1] This policy also covered both compensatory and punitive damages and included an agreement to defend Circle K against claims such as Rummel's. The company did, however, reserve the right to negotiate and settle any claim as it deemed expedient.

Lexington: Lexington agreed to pay up to $10,000,000 for losses that exceeded the $6,000,000 covered by the underlying insurance policies. Lexington's policy described the underlying insurance as being comprised of the $250,000 SIR, Columbia's $750,000, and ISLIC's $5,000,000. Punitive damages were expressly excluded from Lexington's coverage. Lexington was not "obliged to assume charge of the settlement or defense of any claim or suit" brought against Circle K, though it did reserve the right to participate in any such proceeding.[2]

Harbor, St. Paul: Harbor Insurance Company and St. Paul Surplus Lines In-

---

1. International Surplus Lines Insurance Company, Commercial Comprehensive Catastrophe Liability Policy, No. 531–000406–8, "Coverage."

2. Lexington Insurance Company, Following Form—Excess Liability Policy, No. 5523099, ¶ V "Settlement and Defense" [hereinafter Lexington Policy].

surance Company provided coverage for amounts that exceeded the limits of the previous four policies. These layers of coverage are not implicated in this appeal.

7. In November, shortly after the trial, Circle K gave notice of the Rummel verdict to all its personal liability insurers and requested that they pay the judgment, settle with Rummel, or take over the appeal of the judgment. In January 1993, the insurers were notified that Circle K had "agreed to satisfy $250,000 of the judgment by granting plaintiff status as a pre[-bankruptcy]-petition creditor." Circle K also demanded "that the excess carriers settle this claim within their limits." A meeting to discuss a settlement was proposed for early February.[3]

8. In a letter dated February 9, 1993, ISLIC informed Circle K that it would take over the appeal of the Rummel judgment and that it would assume "coverage for the Rummel claim, subject only to its limits of liability, and the requirements for the underlying insurance, and/or SIR[s] or deductibles."[4] All the other personal injury insurers, including Lexington, expressly refused Circle K's insistence that they pay, settle, or defend. The companies, in their responses to Circle K's demands, also prohibited Circle K from engaging in any unilateral settlement with Rummel.

9. By May 1993, it was apparent that Rummel, Circle K, and ISLIC had been negotiating a settlement. The other insurance companies did not participate in these discussions. Lexington alleges that the discussions were secretive, collusive, and devious, and that the three participants deliberately prevented the participation of the other insurers. Rummel claims, on the other hand, that Lexington acted in bad faith by never contributing to Circle K's defense on appeal, never rescinding its denial of coverage, and never offering to participate in settlement negotiations.

10. Around March of 1994, Rummel, Circle K, and ISLIC reached a final settlement agreement, contingent upon the approval of the bankruptcy court that was overseeing Circle K's Chapter 11 reorganization. This approval was granted on March 3, 1994. See In re Circle K Corp., Nos. 90–5052 PHX–GBN to 90–5075 PHX–GBN, slip op. ¶¶ 1, 2, 6 (Bankr.D.Ariz. Mar. 3, 1994). The settlement included the following terms:

A. The SIR was satisfied with a $500,000 unsecured general creditor claim under Circle K's bankruptcy reorganization.[5] The bankruptcy court, in approving the settlement, required that this claim be used for compensatory and not punitive damages. In re Circle K Corp., slip op. ¶¶ 1, 2, 6.

B. ISLIC agreed to reimburse most of Circle K's workers' compensation payments and to pay Rummel "the sum of $1.625 million for punitive damages."[6] The parties agreed that, with these payments, ISLIC's $5,000,000 in coverage was fully satisfied.[7]

C. Circle K assigned to Rummel any of its potential "actions for bad faith, unfair insurance or trade practices, breach of contract, enforcement of contractual rights or any other action" against the insurance companies that had refused Circle K's demands that they pay, settle, or defend.[8]

D. The parties agreed that, "the appeal of the RUMMEL judgment shall be dismissed with prejudice, and without costs."[9]

---

3. Letter from John W. Morrison, attorney for Circle K, to numerous representatives of Columbia, St. Paul, ISLIC, Lexington and Harbor insurance companies (Jan. 28, 1993).

4. Letter from Jeffrey A. Goldwater, attorney for ISLIC, to John W. Morrison, attorney for Circle K (Feb. 9, 1993).

5. Rummel, Circle K, ISLIC Settlement Agreement ¶ 2 (Mar. 3, 1994) [hereinafter Rummel Agreement].

6. Rummel Agreement ¶¶ 4, 7.

7. Rummel Agreement ¶ 9.

8. Rummel Agreement ¶ 6.

9. Rummel Agreement ¶ 12.

E. Rummel agreed that, except as provided by the settlement agreement, he would relinquish any claims, proceedings, or rights he might be able to enforce against Circle K and ISLIC. Included was a covenant not to execute against Circle K and ISLIC on the $11,742,844.28 judgment.[10]

11. The same date the settlement was formalized, Rummel, individually and as assignee of Circle K, filed a lawsuit against Lexington and the other insurers who failed to help resolve the Rummel judgment. His claims against Lexington included bad faith, breach of contract, and violations of the "Unfair Practices Act," NMSA 1978, §§ 57–12–1 to –22 (1967, as amended through 1995), and the Unfair Insurance Practices Act, NMSA 1978, §§ 59A–16–1 to –30 (1984, as amended through 1993).

12. Rummel's complaint against Lexington was based upon a strategy of allocating the compensatory and punitive damages so as to collect the greatest amount of money from each insurer. Thus, the liabilities of Columbia and ISLIC, totalling $5,750,000, were allocated exclusively to the punitive damages. Circle K's SIR of $250,000 was applied to the compensatory damages. With these allocations, the first $6,000,000 in underlying coverage was exhausted, thus triggering Lexington's liability. Rummel alleged that, though Lexington owed nothing for punitive damages, it was responsible for paying the outstanding compensatory damages not covered by the settlement. The following chart illustrates how Rummel allocated the insurance funds:

| Insurer | $10,700,000 Punitive | $1,042,844.28 Compensatory |
|---|---|---|
| Circle K SIR | - | $250,000 fully satisfied by $500,000 unsecured general creditor claim in Circle K's bankruptcy |
| Columbia | $750,000 (as yet unpaid) | - |
| ISLIC | $5,000,000 fully satisfied under $1,625,000 settlement | - |

At this point the $6,000,000 of insurance underlying Lexington's policy was expended.

| | | |
|---|---|---|
| Lexington | - | $792,844.28 (as yet unpaid) |
| **Balance** | $4,950,000 | $0.00 |

13. After months of legal proceedings, Lexington moved for summary judgment in December of 1994. Lexington's motion centered on three main assertions: (1) Lexington's excess coverage could not be reached unless the underlying insurance of $6,000,000 was paid in full, in cash. This payment was not satisfied because Circle K provided a lien on its assets in lieu of paying the SIR, Columbia refused to pay anything, and ISLIC was credited for the full $5,000,000 of its policy when, in reality, it had paid only a portion thereof. (2) Lexington's policy did not cover punitive damages and would thus never be reached because Rummel's compensatory damages were more than covered by the underlying insurance. (3) Rummel could not apportion the payments between compensatory and punitive damages. Rather, he was required to apply all proceeds received from the underlying carriers to first pay off compensatory damages.

14. Rummel responded in February 1995 with a motion for partial summary judgment. On March 14, 1995, the trial court granted

**10.** Rummel Agreement ¶ 13.

Lexington's motion for summary judgment, effectively dismissing all of Rummel's claims against Lexington. Rummel filed an appeal to this Court on April 12, 1995, arguing that this case raised issues of first impression concerning the interpretation of insurance contracts.

## II. STANDARD OF REVIEW

### A. Summary Judgment

■ 15. Summary judgment is appropriate if one party can "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Rule 1–056(C) NMRA 1997. On appeal, we examine the whole record for any evidence that places a genuine issue of material fact in dispute. *C & H Constr. & Paving, Co. v. Citizens Bank,* 93 N.M. 150, 158, 597 P.2d 1190, 1198 (Ct.App. 1979). In evaluating the pleadings and evidence, we will balance our determination in support of the parties' right to a trial on the issues. *Jacobson v. State Farm Mut. Auto. Ins. Co.,* 81 N.M. 600, 601, 471 P.2d 170, 171 (1970). If we find a genuine controversy as to any material fact, summary judgment will be reversed and the disputed facts will be argued at trial. *See Gardner–Zemke Co. v. State,* 109 N.M. 729, 732, 790 P.2d 1010, 1013 (1990).

■ 16. If the facts are not in dispute, and only the legal significance of the facts is at issue, summary judgment is appropriate. *Id.* However, on appeal, when the trial court's grant of summary judgment is grounded upon an error of law, the case may be remanded so that the issues may be determined under the correct principles of law. *Garcia v. Sanchez,* 108 N.M. 388, 395, 772 P.2d 1311, 1318 (Ct.App.1989).

17. In this case we conclude that the questions of bad faith surrounding the settlement negotiations raise genuine issues of material fact. We also conclude that, based upon principles of contract construction, the trial court, as a matter of law, misconstrued Lexington's policy, and that the proper interpretation of the contract should be applied to the facts of this case.

### B. Contract Interpretation

18. It is well settled that, absent a statute to the contrary, "insurance contracts are construed by the same principles which govern the interpretation of all contracts." 2 Lee R. Russ & Thomas F. Segalla, *Couch on Insurance 3D* § 21:1 (1996) [hereinafter *Couch 3d* ]; *Jaramillo v. Providence Washington Ins. Co.,* 1994 NMSC 015, 117 N.M. 337, 340, 871 P.2d 1343, 1346 (1994). We will disentangle this case by applying principles of contract construction to the language of Lexington's policy.

■ 19. Ambiguities arise when separate sections of a policy appear to conflict with one another, when the language of a provision is susceptible to more than one meaning, when the structure of the contract is illogical, or when a particular matter of coverage is not explicitly addressed by the policy. *See* 2 *Couch 3d, supra,* § 21:14; *C.R. Anthony Co. v. Loretto Mall Partners,* 112 N.M. 504, 509 n. 2, 817 P.2d 238, 243 n. 2 (1991). The resolution of ambiguities becomes a matter for the court and is often described as a matter of law rather than a factual determination. *See* 2 *Couch 3d, supra,* § 21:13; *C.R. Anthony,* 112 N.M. at 510 n. 5, 817 P.2d at 244 n. 5.

In determining the existence of an ambiguity, the language at issue should be considered not from the viewpoint of a lawyer, or a person with training in the insurance field, but from the standpoint of a reasonably intelligent layman, viewing the matter fairly and reasonably, in accordance with the usual and natural meaning of the words, and in the light of existing circumstances, prior to and contemporaneous with the making of the policy.

2 *Couch 3d, supra,* § 21:14.

■ 20. The insurance contract—with its declarations, endorsements, and any other attachments—will be construed as a whole. 2 *id.* § 21:19. If any provisions appear questionable or ambiguous, we will first look to whether their meaning and intent is explained by other parts of the policy. *See* 2 *id.* § 21:9. The traditional rules of punctuation, syntax, and grammar may also help clarify a contractual ambiguity. *See C.R.*

*Anthony,* 112 N.M. at 510 n. 5, 817 P.2d at 244 n. 5.

█ 21. If ambiguities cannot be resolved by examining the language of the insurance policy, courts may look to extrinsic evidence such as the premiums paid for insurance coverage, the circumstances surrounding the agreement, the conduct of the parties, and oral expressions of the parties' intentions. *Mark V, Inc. v. Mellekas,* 1993 NMSC 001, 114 N.M. 778, 781, 845 P.2d 1232, 1235 (1993) ("The court is no longer restricted to the bare words of the agreement in interpreting the intent of the parties to a contract, but may also consider the context in which the agreement was made to determine whether the party's words are ambiguous."); *Jaramillo,* 1994 NMSC 015, 117 N.M. at 341–42, 871 P.2d at 1347–48.

█ 22. The court's construction of an insurance policy will be guided by the reasonable expectations of the insured. 2 *Couch 3d, supra,* § 22:11. An ambiguity in an insurance contract is usually construed against the insurer, because courts will weigh their interpretation against the party that drafted a contract's language. *See* 2 *id.* § 22:14; *Federal Ins. Co. v. Century Fed. Sav. & Loan Ass'n,* 1992 NMSC 009, 113 N.M. 162, 167, 824 P.2d 302, 307 (1992) [hereinafter *Federal Ins. Co. v. Century* ]. Mitigating this rule is the requirement that courts adopt the interpretation that is most in accord with reason and the probable expectations of the parties. *See* 2 *Couch 3d, supra,* § 22:10. Thus, it is more accurate to state that ambiguous terms will "be given the strongest interpretation against the insurer which they will reasonably bear." 2 *id.* § 22:14.

█ 23. In order to refute these presumptions in favor of the insured, the insurer must be able to give evidence that supports the construction for which it advocates. 2 *id.* § 22:13. The insurer's interpretation, especially when it concerns an exclusion to the overall coverage, must be clearly expressed in the policy. *See* 2 *id.* § 22:30.

**11.** Lexington Policy ¶ I "Insuring Agreements"

## III. LEXINGTON'S POLICY DOES NOT REQUIRE THE UNDERLYING INSURANCE TO BE PAID IN FULL, IN CASH

█ 24. Lexington argues that its coverage is not initiated until the underlying insurers pay the limits of their policies in full, in cash. This case presents three circumstances in which underlying insurance may not be paid in full, in cash: the insurer may be unable to pay because of insolvency and bankruptcy, as is the case with Circle K's SIR; or the underlying insurer may refuse to pay, as has Columbia; or the insurer may negotiate a settlement for less than the policy limits, as has ISLIC. Lexington describes the requirement of full payment in cash as a condition precedent that none of the three underlying insurers have fulfilled.

25. The resolution of this issue turns on the language of the excess insurer's policy. As such, though we may find guidance in other similar cases, this issue must be resolved on the facts of this particular case and on the language of the individual insurance contract. Regarding this issue, Lexington's policy is not ambiguous. It unequivocally makes allowances for the partial payment and nonpayment of the underlying insurance.

26. We will begin by examining the policy language stipulating that "[l]iability of the Company under this policy shall not attach unless and until the Insured's Underlying Insurance *has paid or has been held liable to pay* the total applicable underlying limits." [11] The rules of semantics and grammar will assist in clarifying this contractual provision. *See C.R. Anthony,* 112 N.M. at 510 n. 5, 817 P.2d at 244 n. 5. The words "has paid" arguably connote the meaning advocated by Lexington: that the underlying insurers have actually paid in cash "the total applicable underlying limits." *But see Zeig v. Massachusetts Bonding & Ins. Co.,* 23 F.2d 665, 666 (2d Cir.1928) ("There is no need of interpreting the word 'payment' as only relating to payment in cash. It often is used as meaning the satisfaction of a claim by compromise, or in other ways.").

(emphasis added).

27. However, this sentence also includes the phrase "has been held liable to pay." It would be senselessly redundant for this phrase to also connote the idea of payment in full, in cash. The rules of contract construction prohibit such an absurd interpretation. *See* 2 *Couch 3d, supra,* § 22:10. "Has been held" is the present perfect progressive form of the verb "to hold," which, in this context, means "to bind legally." *Webster's Third New International Dictionary* 1078 (1961) ("hold" definition 2(e)). The act that legally binds someone to pay—such as a judgment or a bona fide payment demand by the insured—precedes the actual act of paying. Being held liable to pay is a completely different circumstance than actually handing over a cash payment.

28. Additionally, the present perfect progressive tense describes action in progress in the past that could possibly continue into the future. William A. Sabin, *The Gregg Reference Manual* ¶ 1034(d) (7th ed. 1992), Thus, Lexington's policy expressly allows for situations in which an insurer was in the past bound legally to pay, but has up to the present made no payment, and whose nonpayment may continue into the future. In construing a policy with virtually identical language—"have paid or have been held liable to pay"—a federal district court in Wisconsin concluded that "[t]he policy in this case does not state that actual payment is required." *Kelley Co. v. Central Nat'l Ins. Co. of Omaha,* 662 F.Supp. 1284, 1287–89 (E.D.Wis.1987).

29. This interpretation of "held liable" is corroborated by other sections of the policy. *See* 2 *Couch 3d, supra,* § 21:9 (stating doubtful clauses should be construed in light of other parts of the policy). The policy begins with a general description of its coverage:

> Lexington Insurance Company ... in consideration of the payment of premium and in reliance upon the statements in the Declarations made a part thereof, hereby agrees to indemnify [Circle K Corporation] *against "loss"* which is [in] excess of the total limit(s) of all Underlying Insurance

... subject to the limit of liability [of $10,000,000.][12]

The word "loss" from this paragraph is explained in the policy's "Definitions":

> The word "Loss" shall be understood to mean the *sums paid or payable* in settlement of claims for which the Insured is liable after making deductions for all other recoveries, salvages or other insurance (other than recoveries under underlying insurance, *whether recoverable or not*) and shall exclude all expenses and costs.[13]

The reference to "sums paid" refers to the combined liability of Lexington and the underlying insurers. This language arguably connotes a requirement of full payment by the underlying insurers. However, this definition also includes sums that are "payable." The word "payable" in this context is synonymous with "due" which means "having reached the date at which payment is required." *Webster's, supra,* at 699 ("due" definition 6); *id.* at 1659 ("payable" definition 1(a)). Once again the policy explicitly provides for claims that the underlying insurers are required to pay, but which have not, at present, been paid.

30. Furthermore, "loss" includes the amounts owed by the underlying insurance "whether recoverable or not." These words would most logically be construed by the reasonably intelligent layperson as acknowledging the possibility that recovery from the underlying insurers may never happen. *See* 2 *Couch 3d, supra,* § 21:14 (policy words understood by their natural meaning). Even so, Lexington, by the terms of its policy, would still be liable for its portion of the "loss" above the $6,000,000 "total limit(s) of all Underlying Insurance."

31. Other language in the policy also suggests that Lexington's liability does not diminish if the underlying insurance is not fully recoverable. Lexington delineates its rights should the underlying insurance lapse because Circle K failed to pay the premiums:

> Failure of [Circle K Corporation] to [maintain the Underlying Insurance in full effect] *shall not invalidate this policy,* but in

---

**12.** Lexington Policy ¶ I "Insuring Agreements" (emphasis added).

**13.** Lexington Policy ¶ XII "DEFINITIONS" (emphasis added).

the event of such failure, *[Lexington] shall only be liable to the same extent* as it would have been had the Named Insured so maintained such policy or policies.[14]

The most straightforward interpretation of this language is that even if the underlying insurance lapses and becomes useless, Lexington's policy will remain valid and unchanged. The phrase "liable to the same extent as it would have been had the Named Insured so maintained such policy" can only mean that Lexington is still liable for those damages that exceed $6,000,000, even if the underlying $6,000,000 is not fully paid. The lapse of an underlying policy is analogous to the nonpayment and partial payments of the underlying policies in this case. Lexington has failed to offer evidence that supports a contrary interpretation. *See 2 Couch 3d, supra,* § 22:13 (insurance company must document its proposed interpretation).

32. The cases cited by Lexington to support its argument address insurance policies that contain completely different terms from those in this case. For example, *Johnson v. Milgo Industries* concerned a policy which flatly stated that the excess insurer's liability would not attach until the insured or one of its underlying insurers "has paid the amount of retained limit." *Johnson v. Milgo Indus., Inc.,* 458 F.Supp. 297, 300 (D.Minn.1978), *aff'd, Johnson v. U.S. Fire Ins. Co.,* 586 F.2d 1291 (8th Cir.1978). The *Johnson* court concluded that this underlying limit was not paid, and therefore, liability did not attach to the excess insurer. *Id.* at 301–02.

33. In contrast, the actual payment in cash of $6,000,000 is not a condition precedent under Lexington's policy. Lexington could have included explicit language that would have insisted upon such a requirement. 2 *Couch 3d, supra,* § 22:30 (exceptions to a policy must be clearly expressed). Lexington argues that it could never write a policy that would anticipate every wily effort by sophisticated plaintiff attorneys to undermine the intended scope of its policy. However, Lexington's policy unambiguously anticipates circumstances in which the underlying insurance is *not* paid in full, in cash.

## A. Indemnity

34. In refuting Rummel's arguments, Lexington contends that its policy provides only for indemnity to Circle K. It claims that its coverage would not be triggered until Circle K had paid out of its own funds a loss exceeding $6,000,000. Only upon such a payment would Lexington reimburse Circle K for the amount above $6,000,000.

35. For support, Lexington points to *United States Fire Insurance Co. v. Lay.* That case involved an excess indemnity policy, in which the excess insurer would reimburse the primary insurer for any amount paid above its $100,000 contractual limit. *United States Fire Ins. Co. v. Lay,* 577 F.2d 421, 422 (7th Cir.1978). However, the primary insurer settled for $70,000, receiving a $100,000 credit toward a $150,000 judgment. The parties to the settlement expected the excess insurer to pay the amount above $100,000. *Id.* The court concluded that because the primary insurer never paid any amount above its policy limit, there was nothing for the excess insurer to indemnify. *Id.* at 423. Under this line of reasoning, if Lexington had provided an indemnity policy, it would not have to pay until Circle K made cash payments in excess of $6,000,000.

36. Rummel, on the other hand, contends that Lexington is providing a liability policy which pays on behalf of Circle K any amount above $6,000,000 for which Circle K is liable. *See Little v. MGIC Indem. Corp.,* 836 F.2d 789, 793–94 (3d Cir.1987) (defining liability and indemnity polices). Other courts have resolved this issue by examining the specific language of the insurance policies in question. *See, e.g., Okada v. MGIC Indem. Corp.,* 823 F.2d 276, 280 (9th Cir.1986); *American Cas. Co. of Reading, Pa. v. Bank of Mont. Sys.,* 675 F.Supp. 538, 541–42 (D.Minn.1987).

37. Lexington points to its policy provision in which the insurer "*hereby agrees to indemnify* the insured ... against 'loss' which is excess of the total limit(s) of all

---

14. Lexington Policy ¶ VI "MAINTENANCE OF      UNDERLYING INSURANCE" (emphasis added).

Underlying Insurance." [15] This provision in which Lexington agrees to indemnify Circle K for "loss" is contradicted by the definition of "loss" which discusses "the sums paid or payable in settlement of claims for which the Insured is liable." [16] As we have demonstrated, the word "payable" connotes payments that have yet to be made. How can Lexington reimburse its insured for payments that have yet to be made? "[I]f two clauses are inconsistent and both were prepared by the insurer, ... the one which affords the most protection to the insured will control and be given effect." 2 *Couch 3d, supra,* § 21:9. We therefore conclude that Lexington's liability under its policy is not limited to indemnification.

38. We will briefly examine how Lexington's policy addresses the circumstances of the underlying insurers in this case.

### B. Circle K's Insolvency

■ 39. Lexington argues that the unsecured claim in Circle K's bankruptcy does not suffice as a payment of the $250,000 SIR. This argument is refuted by Lexington's own policy which guarantees the payment of "loss" whether the underlying insurance is "recoverable or not." [17] Additionally, should underlying coverage lapse, Lexington is "liable to the same extent" as it would have been had the insurance been maintained "in full effect." [18] The satisfaction of the SIR with an unsecured bankruptcy claim reasonably falls within the class of insurance that has not been maintained "in full effect" and may not be "recoverable."

40. Public policy supports this construction of Lexington's contract. It is the debtor in need of financial relief who receives the protections granted by the bankruptcy process. Such benefits were never intended to absolve third parties of debts they share in common with the debtor. *Landsing Diversified Properties–II v. First Nat'l Bank & Trust Co. (In re Western Real Estate Fund, Inc.),* 922 F.2d 592, 600 (10th Cir.1990), *mod-*

ified on other grounds, *Abel v. West,* 932 F.2d 898 (10th Cir.1991). To conclude otherwise would bestow a windfall upon insurers. *West v. White (In re White),* 73 B.R. 983, 985 (Bankr.D.D.C.1987); *Jessie v. Honosky (In re Honosky),* 6 B.R. 667, 669 (Bankr. S.D.W.Va.1980).

> [I]f an insurance company is as a matter of state law liable to a plaintiff in a personal injury action, subsequent discharge of the assured in bankruptcy does not alter the obligation of the insurance company. It seems clear that it is the policy of the law to discharge the bankrupt but not to release from liability those who are liable with him.

*In re Bracy,* 449 F.Supp. 70, 71 (D.Mont. 1978). We disagree with cases that have expressed a contrary opinion. *See, e.g., New Process Baking Co. v. Federal Ins. Co.,* 923 F.2d 62, 63 (7th Cir.1991) ("[T]he insolvency of the underlying insurer ... cannot trigger the excess insurer's obligation to pay.").

### C. Columbia's Refusal to Pay

41. Columbia has refused to make any payment whatsoever on its $750,000 underlying policy. Therefore, Lexington claims that, because its excess coverage is not triggered, it is relieved of any liability. Other jurisdictions have declared that liability of the excess insurer should not be increased by the bad faith or erroneous conduct of the primary insurer. *Kelley Co.,* 662 F.Supp. at 1286–87. By the same token, the excess insurer should not gain a windfall, and the insured should not bear the loss, when the underlying insurer refuses to honor its policy. *Cf. White,* 73 B.R. at 985 (insurer not entitled to windfall); *Honosky,* 6 B.R. at 669 (same idea).

■ 42. The refusal of the underlying insurer to pay—whether because of a good faith assessment of the claim, through error or mistake, or as an act of bad faith—can cause significant delays and great hardship to the insured. If the underlying insurer, based upon a good faith interpretation of its

---

**15.** Lexington Policy ¶ I "Insuring Agreements" (emphasis added).

**16.** Lexington Policy ¶ XII "DEFINITIONS."

**17.** Lexington Policy ¶ XII "DEFINITIONS."

**18.** Lexington Policy ¶ VI "MAINTENANCE OF UNDERLYING INSURANCE."

contract, refuses to pay, the excess insurer is not necessarily relieved of liability under its contract. Similarly, it would be unjust to grant reprieve to the excess insurer simply because the underlying insurer is denying payment through mistake or bad faith. This is especially true in this case, in which Lexington's policy guarantees payment whether. the underlying insurance is "recoverable or not." [19]

### D. ISLIC Settlement

■ 43. Lexington asserts that ISLIC, having reached a settlement for merely $1.65 million, should not be permitted "credit" for the full $5,000,000 guaranteed by its policy. However, nothing in Lexington's policy precludes an underlying insurer-once it has "been held liable to pay" [20]—from settling for an amount less than its policy limits, and being credited for the balance. Several courts have permitted such settlements, although under policy language that differs from that before us. *See, e.g., Teigen v. Jelco of Wis., Inc.,* 124 Wis.2d 1, 367 N.W.2d 806, 809–12 (1985); *Gasquet v. Commercial Union Ins. Co.,* 391 So.2d 466, 472 (La.Ct. App.1980); *Stargatt v. Fidelity & Cas. Co.,* 67 F.R.D. 689, 690–91 (D.Del.1975), *aff'd,* 578 F.2d 1375 (3d Cir.1978); *Zeig,* 23 F.2d at 665–66; *see also* 1A Rowland H. Long, *The Law of Liability Insurance* § 5A.15 (1995) ("Where the primary insurer settled with the claimant for an amount less than its policy limits, but that settlement provided that the entire amount of the policy limits would be deducted from any recovery in order to determine the excess carrier's liability under its policy, the primary insurer did not breach any duty to settle which might have been owed to the excess carrier.").

44. There are strong public policy reasons for permitting the underlying insurer to settle for less than its policy limits. For example, the excess insurer has no rational interest in whether the primary policies are collected in full, as long as it is only required to pay the loss for which it would otherwise have been liable under the terms of its con-

tract. *Zeig,* 23 F.2d at 666. Additionally, "[t]o require an absolute collection of the primary insurance to its full limit would in many, if not most, cases involve delay, promote litigation, and prevent an adjustment of disputes which is both convenient and commendable." *Id.* Also, settlements made by claimants with their primary insurers are less burdensome both on the judicial system and on the parties to an insurance contract. *See Critz v. Farmers Ins. Group,* 230 Cal. App.2d 788, 41 Cal.Rptr. 401, 408 (1964) ("The law favors settlements."); *Gasquet,* 391 So.2d at 471.

### IV. LEXINGTON'S POLICY DOES NOT PRECLUDE ALLOCATION

■ 45. The seventh endorsement to Lexington's policy states that "IT IS AGREED THAT THE COVERAGE AFFORDED BY THIS POLICY SHALL NOT APPLY TO PUNITIVE OR EXEMPLARY DAMAGES." [21] The parties do not dispute that Rummel's $10,700,000 punitive damages award is not covered by Lexington's policy. Lexington points out that it pays nothing until the underlying insurers have been held liable to pay $6,000,000, an amount far in excess of Rummel's $1,042,844.28 compensatory damages award. Thus, Lexington claims it has no liability whatsoever for the Rummel judgment.

46. Circle K was compelled by the bankruptcy court to apply the $500,000 unsecured general creditor claim toward compensatory damages, leaving $792,844.28 of the compensatory award unpaid. Lexington asserts that the plan of allocating punitive damages to ISLIC and Columbia in an attempt to force Lexington to pay the balance of compensatory damages was an unconscionable violation of Circle K's contract with Lexington.

47. As above, we will address this assertion by examining Lexington's contract and applying principles of contract law. *See* 2 *Couch 3d, supra,* § 21:1. Substantial portions of Lexington's policy are devoted to the requirements of the underlying insurance. However, Lexington's policy is silent on the

---

**19.** Lexington Policy ¶ XII "DEFINITIONS."

**20.** Lexington Policy ¶ I "Insuring Agreements."

**21.** Lexington Policy, "ENDORSEMENT # 7."

allocation of compensatory and punitive damages. Nothing in the policy requires the underlying insurance to be first applied to compensatory damages. Nothing prevents the allocation of damages so as to provide maximum protection for the insured.

■ 48. The silence of Lexington's contract regarding allocation is not a "patent" ambiguity that is apparent on the face of the written insurance contract. 2 *id.* § 21:13. Rather, it is more accurately characterized as a "latent" ambiguity in which policy language that is otherwise clear appears ambiguous upon application to a particular circumstance. 2 *id.*

■ 49. Despite this apparent silence, Lexington insists that the allocation of punitive damages to the underlying insurance is excluded from its policy. The rules of contract construction are especially narrow when applied to the exclusionary provisions of insurance policies. "The insurer has the right to contract with the insured as to what risks it will or will not assume, as long as neither statute law nor public policy is violated thereby." 2 *id.* § 22:30. The court will give force and effect to policy provisions that clearly express conditions precedent or exclusions to coverage. 2 *id.* However, "exclusionary clauses must be narrowly construed." *Knowles v. United Servs. Auto. Ass'n,* 1992 NMSC 028, 113 N.M. 703, 705, 832 P.2d 394, 396 (1992). If the insurer urges an exclusion to coverage that the policy does not clearly express, "the courts will not write an exception into it by construction, for the purpose of exempting the insurer from liability." 2 *Couch 3d, supra,* § 22:30.

■ 50. Lexington could have included a provision in its policy that made its excess layer of coverage operative only after all underlying insurance was applied to the compensatory damages part of an award. It is not the province of the courts to supply provisions to an insurance policy when insurers are faced with an unanticipated liability. *See First Bank (N.A.)—Billings v. Transamerica Ins. Co.,* 209 Mont.93, 679 P.2d 1217, 1222–23 (1984) (insurance companies are more capable than courts of assessing risks and setting limits to liability). Lexington

should have been aware that Circle K, in entering the contract with Lexington, intended to derive the maximum benefit from the insurance coverage. 2 *Couch 3d, supra,* § 22:11 ("[A]n insured's reasonable expectations upon reading the policy should guide construction ..."); *Federal Ins. Co. v. Century,* 113 N.M. at 168, 824 P.2d at 308 ("Giving effect to the insured's reasonable expectations, in cases of policy ambiguity, is of course a well-settled approach to construing and applying language in insurance policies."). Nothing inherent in the nature of compensatory and punitive damages logically prevents the allocating of funds toward that end.

51. Lexington cites no rule of law that refutes our conclusion on this issue. At least one other court has indicated that no such rule exists: "[T]here is clearly no legal requirement that the liability carrier satisfy the punitive damages before it satisfies the compensatory damages." *West v. Pratt,* 871 S.W.2d 477, 480 (Tenn.1994). Similarly, we have been alerted to no custom of the insurance trade that requires primary insurance funds to be first applied to compensatory damages.

52. Further, we have found no case law, and the parties have alerted us to no precedent, that discusses the issue of allocating compensatory and punitive damages between primary and excess insurers. We have found a few analogous cases that deal with attempts to apportion compensatory and punitive damages between a plaintiff's uninsured-underinsured-motorist insurance-carrier and a defendant's general-liability insurer. These cases are factually distinct from the one before us.

53. For example, *West v. Pratt,* centered on the Tennessee statutory provision which holds that uninsured-motorist carriers, absent a specific contrary provision in the policy, are not liable for punitive damages recovered by their insureds. *Pratt,* 871 S.W.2d at 478–79. Because of this statute, the defendant's general-liability insurer chose to pay the limit of its policy by paying all the punitive damages and a portion of the compensatory damages. This left the uninsured carrier liable for

the remainder of the compensatory damages. *Id.* at 478. The court held that the uninsured carrier was not liable, reasoning that "[w]hile it is technically true that [the uninsured-motorist carrier] must pay only compensatory damages after the allocation procedure, the indubitable effect of this procedure is to shift responsibility for the payment of punitive damages from the liability carrier to the [uninsured-motorist] carrier." *Id.* at 479. The court reasoned that the statute had established a "clear public policy" against *indirectly* exposing uninsured carriers to liability for punitive damages through the allocation of those punitive damages to the defendant's liability insurer. *Id.* at 478–79.

54. The *Pratt* decision conflicts directly with the principle we uphold today: There is no public policy or statute or contractual provision that requires the underlying insurance (the analog to the defendant's general-liability insurance) to be first applied to compensatory damages rather than punitive damages at the expense of the best interests of the insured. *See also Home Ins. Co. v. Tooke,* 174 Wis.2d 47, 496 N.W.2d 749, 750–52 (Ct.App.1993) (discussed below); *Hilton v. Dougherty,* 1989 WL 37263, slip op. at *1–2 (Tenn.Ct.App. April 20, 1989) (unpublished opinion of no precedential value, holding that allocation was permitted; subsequently indirectly refuted by contrary holding in *Pratt,* 871 S.W.2d at 478–79).

55. In the absence of an express exclusion, a rule of law, dispositive practices of the insurance trade, or convincing judicial precedent, Lexington's contract does not preclude the allocation of compensatory and punitive damages.

## V. THE SETTLEMENT NEGOTIATIONS RAISE ISSUES OF MATERIAL FACT

■ 56. Rummel's interpretation of Lexington's insurance contract was reasonable. However, we believe issues of material fact do exist · concerning the settlement agreement. *Cf. Miller v. Fairchild Indus., Inc.,* 797 F.2d 727, 735 (9th Cir.1986) (stating that summary judgment is inappropriate

when "the circumstances surrounding the agreement's formation permit conflicting factual inferences").

57. Lexington, under its contract, had no duty to Circle K to either settle or defend:

> Anything in the Underlying Insurance to the contrary notwithstanding, *the Company shall not be obliged to assume charge of the settlement or defense of any claim or suit brought or proceeding instituted against the Insured,* but the Company, at its option but not being required to, shall have the right and be given the opportunity to associate with the Insured in the defense or control of any claim, suit or proceeding which appears reasonably likely to involve the Company, in which event the Insured and the Company shall cooperate in all things in the defense or control of such claim, suit or proceeding.[22]

However, some of the facts in the record suggest that, while Lexington may have had no duty to "assume charge" of the settlement negotiations, it may have acted improvidently, if not in bad faith, by refusing to keep abreast of the negotiations. Rummel claimed soon after the judgment that he expected recovery of damages from Lexington. Arguably, Lexington was alerted that it had an interest, if not a responsibility, to at least keep itself informed about the settlement's progress. It is not unheard of for insurance companies, even though they have refused to "assume charge" of litigation or settlement, to send employees to monitor such proceedings. *See Allstate Ins. Co. v. United Servs. Auto. Ass'n,* 249 Va. 9, 452 S.E.2d 859, 860 (1995) (mentioning employee sent to monitor litigation, even though company reasonably concluded it had no liability and employee had been given no authority to settle). Such an act might have prevented much litigious misunderstanding.

■ 58. If Lexington acted in bad faith by refusing to participate in or at least to monitor the progress of the negotiations, then it abdicated any right to object to the final settlement and it may be liable for damages. *Cf. Critz,* 41 Cal.Rptr. at 408 ("The insurance company's bad faith rejec-

---

22. Lexington Policy ¶ V "Settlement and Defense" (emphasis added).

tion of a settlement offer may effectually wipe out the policy limit on liability."). A court may find bad faith when an insurer refuses to settle after being asked to do so while at the same time demonstrating disregard for the interests of its insured. *See Lujan v. Gonzales,* 84 N.M. 229, 237, 501 P.2d 673, 681 (Ct.App.1972) (discussing the type of conduct that constitutes bad faith on the part of insurers); *State Farm Fire & Cas. Co. v. Price,* 101 N.M. 438, 446, 684 P.2d 524, 532 (Ct.App.1984) (same concept). This is because the insurer's refusal to discuss the settlement of a claim for which it may be liable can influence the final outcome of settlement negotiations. Without the participation of a potential crucial party, the participants to the settlement may be unable to accurately assess the extent of the insured's coverage. The insured may risk greater exposure to personal liability. *Critz,* 41 Cal. Rptr. at 408. A finding of bad faith on the part of Lexington would justify the conduct of the three parties to the settlement negotiations. "It is well settled that, at least after a denial of liability by an insurer, the insured may enter into a settlement with a third party without prejudicing its rights against the insurer." *Bunge Corp. v. London & Overseas Ins. Co.,* 394 F.2d 496, 497 (2d Cir.1968).

■ 59. On the other hand, if Lexington, under the circumstances at the time, reasonably refused to participate in the settlement negotiations, then Rummel's bad faith claims against Lexington would fail. Refusal to settle under the bona fide belief that the judgment might be overturned or that there was no liability under the policy does not constitute bad faith. *See* 7C John Alan Appleman, *Insurance Law and Practice* § 4712, at 455 (Walter F. Berdal ed., 1979) (discussing refusal to settle before trial). However, Lexington would still be liable for the balance of compensatory damages under the terms of its contract. An insurer acts at its peril when it declines to participate in settlement negotiations on behalf of its insured. *Cf. State Farm Mut. Auto. Ins. Co. v. Paynter,* 122 Ariz. 198, 593 P.2d 948, 954 (Ct.App.1979) (making similar remarks about the refusal to defend). Despite the insurer's good faith belief that there was no coverage,

if the court finds coverage upon construction of the insurance contract, then the insurer will be bound by the settlement. *Cf.* 7C Appleman, *supra,* § 4711, at 406–07 (discussing refusal to settle before trial). Under such circumstances, the insured is entitled to settle the claims against it in a manner that is in its best interest. *Cf. Paynter,* 593 P.2d at 951 ("[A]n abandoned insured may enter into a reasonable agreement limiting his liability in order to avoid litigation of the claim at his own expense.").

■ 60. The interpretation of an insurance contract is a matter of law about which the court has the final word. Even though the insurance company drafted the language in its own policy, it is not the final authority on a contract's construction. For this reason, the company should always seriously evaluate a demand or a request by its insured that it participate in negotiations. Though the company may in good faith conclude that under specific facts it owes no duty to its insured, once the matter is litigated, a court may conclude otherwise. The court may view the refusal to participate in settlement negotiations as abandonment or bad faith. In this case, the trial court should admit evidence regarding Rummel's allegations of breach of contract, bad faith, and other related claims.

■ 61. In contrast to Rummel's allegations, Lexington claims that Rummel, Circle K, and ISLIC negotiated secretly and deviously and never invited Lexington to participate in the settlement discussions. Moreover, Lexington accuses the three of misrepresenting the nature of the negotiations, of ignoring its requests for information, and of collusively withholding information. The result was an attempt to coerce Lexington into paying when it, in good faith, believed it had no duty to do so. A settlement that is the product of fraud or collusion at the expense of a nonparticipating insurer would release that insurer from any obligation under the settlement. *Cf. Paynter,* 593 P.2d at 954 (suggesting, in presence of fraud or collusion, insurer has no liability under judgment). "[T]he obligation to deal fairly and honestly rests equally upon the

insurer and the insured." *Price,* 101 N.M. at 444, 684 P.2d at 530.

62. There is authority to suggest that a settlement like the one before us does not bind an insurer who is deprived of a reasonable opportunity to respond to demands that it settle. The Wisconsin case, *Home Insurance Co. v. Tooke,* concerned a defendant who was an underinsured motorist and a plaintiff who held an underinsured-motorist policy. The defendant, his insurer, and the plaintiff agreed that the insurer would pay its full policy limit, dividing that limit between compensatory and punitive damages. *Tooke,* 496 N.W.2d at 750. This division left the plaintiff's underinsured-motorist carrier liable for the balance of the compensatory damages. The plaintiff sent notice of the settlement negotiations to her carrier, demanding a response by a specific date. The carrier did not respond. *Id.* at 751. The court indicated that the carrier was not given a reasonable opportunity to respond and was thus not a party to the settlement. The court held that, because the underinsured carrier "was not a party to the settlement agreement, it cannot be held to the terms negotiated." *Id.* at 752.

63. In this case, if the trial court finds bad faith on the part of Rummel, Circle K, and ISLIC, then Lexington would be released from any liability under the settlement. Therefore, the trial court should admit evidence regarding Lexington's allegations of collusion, bad faith, and other related claims.

## VI. CONCLUSION

64. For the foregoing reasons, we reverse summary judgment and remand for a trial on the merits of the bad faith and related allegations raised by both parties.

65. **IT IS SO ORDERED.**

BACA and McKINNON, JJ., concur.