# IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

Opinion Number: _____

Filing Date: <u>March 28, 2016</u>

**NO. 33,127**

**ALBERT RODARTE,**

  Appellant-Respondent,

v.

**PRESBYTERIAN INSURANCE COMPANY,**

  Appellee-Petitioner,

and

**NEW MEXICO SUPERINTENDENT OF INSURANCE**,

  Appellee.

**APPEAL FROM THE DISTRICT COURT OF SANTA FE COUNTY**
**Raymond Z. Ortiz, District Judge**

Paul D. Mannick
Santa Fe, NM

for Appellant-Respondent

Montgomery & Andrews, P.A.
Walter J. Melendres
Seth C. McMillan
Santa Fe, NM

for Appellee-Petitioner

**OPINION**

**HANISEE, Judge.**

{1}    This case requires us to determine whether certain medical treatment is covered by a plan participant's health benefits plan or required by applicable regulations governing such contracts. After Albert Rodarte's (Rodarte) daughter, Jessica, suffered a severely disabling anoxic brain injury, he sought pre-approval from her health insurance company for Jessica to receive hyperbaric oxygen therapy (HBOT). Presbyterian Insurance Company (Presbyterian) denied the request, concluding that the treatment was not a covered benefit. On review, the New Mexico Superintendent of Insurance (the Superintendent) upheld Presbyterian's denial of coverage, finding that HBOT was an excluded treatment under her Presbyterian plan, and that the use of HBOT to treat Jessica's condition was not "medically necessary" under the New Mexico Administrative Code (the Code).[1] In its appellate capacity, the district court disagreed and reversed the Superintendent in both respects.

{2}    On petition by Presbyterian, this Court accepted certiorari in order to review the

---

[1]Grievance Procedures within the Code were revised effective January 1, 2016. Many regulations, including some pertinent to this appeal, have been renumbered and in some instances modified. In this Opinion, we cite to and apply the regulations in place during the course of the underlying proceedings. We note differences to applicable regulations when necessary or helpful to an understanding of our analysis.

district court's ruling. We hold that Jessica's condition was excluded from those for which her Presbyterian health benefits plan provided HBOT coverage. We also hold that HBOT was not a medically necessary treatment for Jessica's condition under the Code. We therefore reverse the district court.

**BACKGROUND**

{3}     Jessica's injury, identified as "global anoxic encephalopathy," resulted from an incident of cardiac arrest and stroke that deprived her brain of oxygen for approximately seventeen minutes. At the time, Jessica was a freshman at New Mexico State University. Her injury left her profoundly impaired both mentally and physically. After researching Jessica's condition on the internet and learning of HBOT, Rodarte contacted Dr. Kenneth Stoller, who owned and operated a facility offering the treatment. When treated by HBOT, a patient is "enclosed in a pressure vessel and exposed to 100% oxygen at increased atmospheric pressure." While acknowledging that HBOT is "off-label," Dr. Stoller nonetheless maintained it to be a "well-established FDA approved treatment used for a wide variety of conditions[.]" He requested prior authorization from Presbyterian to treat Jessica with a series of forty HBOT sessions.

{4}     Presbyterian denied Dr. Stoller's request because Jessica did "not meet the requirements for the requested" HBOT under the terms of her insurance contract, and

2

because her diagnosis was "a specifically excluded condition for [HBOT] per Presbyterian . . . criteria." When Rodarte requested "adverse determination review" through Presbyterian's internal process of appeal,[2] Presbyterian twice upheld its denial of coverage. It first explained that "HBOT is not a covered benefit . . . due to [Jessica's] cerebral vascular injury[,]" and later elaborated that its decision was additionally justified by the absence of "evidence in the literature that supports treatment with HBOT for Jessica's condition." Presbyterian added that "experimental or investigational services [or] treatments are not covered benefits."

{5}     As permitted by the Code,[3] Rodarte then sought external review by the Superintendent. After first determining that Rodarte's grievance qualified for external review of an experimental or investigational treatment under 13.10.17.28 NMAC (5/15/2012), the Superintendent convened a hearing panel to issue a recommendation regarding the propriety of Presbyterian's denial of coverage. The panel, comprised of two physicians and one attorney, held an informal hearing at which Presbyterian and Rodarte presented evidence in support of their respective positions. Utilizing the same

---

[2]*See* 13.10.17.17(A) NMAC (5/15/2012) (stating that "[e]very grievant who is dissatisfied with an adverse determination shall have the right to request internal review of the adverse determination by the health care insurer").

[3]*See* 13.10.17.23 NMAC (5/15/2012) (setting forth process by which external review by the Superintendent is initiated).

3

regulation initially applied by the Superintendent, the panel considered: (a) whether HBOT "reasonably appears to be a covered benefit under the plan"; (b) whether HBOT "is not explicitly listed as an exclusion under the plan"; and (c) whether HBOT is a "medical necessity."

{6} In its ensuing written recommendation to the Superintendent, the panel noted that Rodarte sought HBOT treatment for anoxic encephalopathy, a condition for which the insurance contract did not specifically include or exclude HBOT coverage. The contract did, however, list certain conditions for which HBOT was available, and excluded "any clinical condition not listed above," specifically naming seven such excluded conditions. The panel advised, however, that "it is not practical for a [p]lan to list all of the diseases and illnesses in the world that are excluded [and] . . . if anoxic encephalopathy is not specifically listed as covered, then it is excluded." The panel recommended that the Superintendent uphold Presbyterian's denial of HBOT coverage under the terms of Jessica's contract and for the additional reason that under the evidence presented and considered, HBOT was not "medically necessary" as an experimental or investigational treatment under the standard given in 13.10.17.28(B) NMAC (5/15/2012).

{7} In a final order, the Superintendent adopted, approved, and accepted the findings and conclusions of the panel, adding that "even if a treatment might be

4

considered a covered benefit, it must also be medically necessary before an adverse determination [of coverage] can be reversed." Thus, the Superintendent identified the issue to be "whether as a result of [Presbyterian's] adverse determination, [Jessica] was deprived of medically necessary covered services." Importantly, the Superintendent did not disturb the panel's conclusion that because "anoxic encephalopathy is not specifically listed as covered, then it is excluded" from coverage under Presbyterian's plan. The Superintendent then made a specific finding that "[t]he HBOT treatment denied by Presbyterian in this case does not meet the requirements necessary to establish medical necessity pursuant to 13.10.17(B) NMAC [(5/15/2012)]."[4] By the Superintendent's order, Presbyterian's adverse determination was upheld.

{8}    Having failed to convince Presbyterian or the Superintendent that HBOT was a covered benefit for Jessica's condition under either her health plan contract or the

---

[4]We note that "13.10.17(B) NMAC [(5/15/2012)]" is not a provision that existed or exists in the Code. It is therefore unclear which "requirements necessary to establish medical necessity" were applied by the Superintendent to determine that HBOT is not medically necessary to treat Jessica. As discussed in greater detail herein, the Code addresses medical necessity in both 13.10.17.7(L) NMAC (5/15/2012) (defining "medical necessity" in the general definitional section) and 13.10.17.28(B) NMAC (5/15/2012) (setting forth the certification requirements of
medical necessity when requesting external review of an experimental or investigational treatment adverse determination).

Code, Rodarte appealed to the district court.[5] There he argued again that the insurance contract covered HBOT for Jessica's condition, contained no effective exclusion, and was "medically necessary" under 13.10.17.28(B) NMAC (5/15/2012). Presbyterian insisted that its plan covers "medically necessary" services as defined not by the Code, but by the insurance contract itself. Presbyterian also maintained that Rodarte failed to establish that the Superintendent's determination of non-medical necessity in this case was unsupported by substantial evidence.

{9}     After initially affirming the Superintendent, the district court was persuaded by Rodarte's motion for reconsideration that its ruling was incorrect. In granting the motion to reconsider, the district court ruled that HBOT "reasonably appears to be a covered benefit" under Jessica's Presbyterian plan, and was not "explicitly listed as an excluded benefit." Applying 13.10.17.28 NMAC (5/15/2012) for the first time, the district court concluded as a matter of law that "Dr. Stoller's certification regarding HBOT as a recommended treatment for Jessica [satisfied] the requirements for medical necessity applicable to experimental and investigational medical procedures." The district court concluded that in its original order, it had "mistakenly applied" the "more general definition of medical necessity found at 13.10.17.7[(L)] NMAC [(5/15/2012)]."

_____

[5]*See* NMSA 1978, § 59A-4-20(A) (2011) (stating that an appeal from "an order of the [S]uperintendent made after an informal . . . or . . . administrative hearing . . . shall be taken to the district court").

6

Ultimately, the district court reversed the Superintendent. This appeal followed.

# DISCUSSION

## Standard of Review

{10} Under NMSA 1978, Section 39-3-1.1(D) (1999), a district court may "set aside, reverse[,] or remand" the final decision of the Superintendent when: "(1) the [Superintendent] acted fraudulently, arbitrarily[,] or capriciously; (2) the final decision was not supported by substantial evidence; or (3) the [Superintendent] did not act in accordance with law." Our review is the same as that of "the district court sitting in its appellate capacity, while at the same time determining whether the district court erred in the first appeal." *Rio Grande Chapter of Sierra Club v. N.M. Mining Comm'n*, 2003-NMSC-005, ¶ 16, 133 N.M. 97, 61 P.3d 806.

{11} We discuss: (1) whether the HBOT treatments are a covered benefit under Presbyterian's plan; (2) whether such treatments are medically necessary under regulations adopted by the Superintendent requiring a plan to provide medically necessary services; and (3) whether the district court was correct to reverse the Superintendent.

## I. Presbyterian's Insurance Contract Does Not Provide HBOT Coverage for Jessica's Medical Condition

{12} The Presbyterian insurance contract states that it "helps pay for healthcare expenses that are [m]edically [n]ecessary and [s]pecifically covered." It defines

8

"[s]pecifically covered" to mean "only those healthcare expenses that are expressly listed and described" in the agreement. Presbyterian's medical policy specifically covers HBOT for certain diabetic wounds, gangrene, compromised skin grafts, and a number of other conditions; however, it does not list HBOT as a covered service for global anoxic encephalopathy. Furthermore, in the "exclusions" section of the HBOT portion of the policy, the policy states, "[a]ny clinical conditions not listed above [are] not covered, including but not limited to" a list of seven conditions, including stroke.

{13}    Presbyterian argues that HBOT for Jessica's specific condition is not covered under the insurance contract as it is not an expressly covered treatment in the agreement. Rodarte contends that because Presbyterian reimburses oxygen and other therapeutic support care services, he "would reasonably expect that HBOT, which is a method of oxygen therapy, would be among the therapeutic and support services Presbyterian promised to provide." Additionally, Rodarte maintains that because HBOT falls under the plan's coverage for short term rehabilitation services, and "HBOT . . . is designed to repair and restore damaged brain tissue," its provision would be internally consistent. Rodarte claims that a contracted plan that reasonably appears to cover oxygen can likewise reasonably be expected to cover HBOT for global anoxic encephalopathy.

{14}    In construing the language of Presbyterian's plan, we are mindful that, "absent

a statute to the contrary, insurance contracts are construed by the same principles which govern the interpretation of all contracts." *Rummel v. Lexington Ins. Co.*, 1997-NMSC-041, ¶ 18, 123 N.M. 752, 945 P.2d 970 (internal quotation marks and citation omitted). The process of contract interpretation "often turns upon whether . . . the contract is ambiguous." *C.R. Anthony Co. v. Loretto Mall Partners*, 1991-NMSC-070, ¶ 12, 112 N.M. 504, 817 P.2d 238. "[W]hen the policy language is clear and unambiguous, [an appellate court] must give effect to the contract and enforce it as written." *Ponder v. State Farm Mut. Auto. Ins. Co.*, 2000-NMSC-033, ¶ 11, 129 N.M. 698, 12 P.3d 960. "If the court determines that the contract is reasonably and fairly susceptible of different constructions, an ambiguity exists." *Mark V, Inc. v. Mellekas*, 1993-NMSC-001, ¶ 12, 114 N.M. 778, 845 P.2d 1232. Whether an agreement contains an ambiguity is a matter of law to be determined by the trial court, and is a question we review de novo on appeal. *Id.*

> In determining the existence of an ambiguity, the language at issue should be considered not from the viewpoint of a lawyer, or a person with training in the insurance field, but from the standpoint of a reasonably intelligent layman, viewing the matter fairly and reasonably, in accordance with the usual and natural meaning of the words, and in the light of existing circumstances, prior to and contemporaneous with the making of the policy.

*Rummel*, 1997-NMSC-041, ¶ 19 (internal quotation marks and citation omitted).

{15} We conclude that the insurance contract unambiguously restricts coverage for

HBOT to a series of named conditions and excludes coverage of HBOT for all other treatments. Jessica's injury does not fall within the exclusive list of covered conditions in the contract, and the contract expressly excludes all non-listed conditions from coverage. As well, the contract expressly excludes strokes, one source of Jessica's injuries, from the scope of HBOT coverage. We are not persuaded by Rodarte's argument that the contract's exclusion of HBOT for all non-covered treatment is ambiguous because the contract elsewhere covers oxygen for rehabilitation treatment. Even assuming the phrase "oxygen" in the contract can be read to include HBOT, "a specific provision [in a contract] relating to a particular subject will govern in respect to that subject, as against a general provision, even though the latter, standing alone, would be broad enough to include the subject to which the more specific provision relates." *Weldon v. Commercial Union Assurance Co.*, 1985-NMSC-118, ¶ 9, 103 N.M. 522, 710 P.2d 89 (internal quotation marks and citation omitted).

{16} As did Presbyterian and the Superintendent, we therefore conclude that the HBOT treatments in this case are not only not specifically covered treatments under the health plan into which Presbyterian and Jessica contracted, they are specifically excluded. We reverse the district court's conclusion to the contrary.

**II. HBOT Is Not Medically Necessary to Treat Jessica's Medical Condition Under the Code**

11

{17} Our Legislature empowered the Superintendent to establish "reasonable rules and regulations necessary for or as an aid to administration or effectuation of any provision of the Insurance Code administered by the [S]uperintendent[.]" NMSA 1978, § 59A-2-9(A) (1997). That authority was employed by the Superintendent to promulgate grievance procedures, which apply to "all health care insurers that provide, offer, or administer health benefit plans[.]" 13.10.17.2(A) NMAC (5/15/2012). One such regulation applicable to insurers such as Presbyterian, 13.10.13.8(C)(1) NMAC, requires, at a minimum, that evidence of health insurance coverage include "a complete statement that a covered person shall have the right . . . to available and accessible services when medically necessary[.]" Therefore, even if the language in a health plan specifically excludes coverage for a treatment or service, the Superintendent's regulations require that it be covered if it is medically necessary. We therefore consider whether the HBOT treatments must be covered under Presbyterian's plan because they are medically necessary under the Code.

{18} Regarding which treatments are medically necessary, 13.10.17.7 NMAC (5/15/2012) supplies various definitions "[a]s used in this rule[.]" The meaning of "medical necessity" or "medically necessary" is set forth in 13.10.17.7(L) NMAC (5/15/2012). Medically necessary treatments are those

health care services determined by a provider, in consultation with the

health care insurer, to be appropriate or necessary, according to any applicable generally accepted principles and practices of good medical care or practice guidelines developed by the federal government, national or professional medical societies, boards and associations, or any applicable clinical protocols or practice guidelines developed by the health care insurer consistent with such federal, national, and professional practice guidelines, for the diagnosis or direct care and treatment of a physical, behavioral, or mental health condition, illness, injury, or disease[.]

13.10.17.7(L) NMAC (5/15/2012).[6]

{19} That definition is either replaced, as argued by Rodarte, or remains substantively applicable to the Superintendent's grievance process, as argued by Presbyterian, when the medical treatment sought under a health plan is characterized as experimental or investigational. 13.10.17.28 NMAC (5/15/2012), the provision advanced by Rodarte as defining medical necessity, primarily referenced by the Superintendent, and relied on as the basis for the district court's final ruling reversing the Superintendent, provides:

If the request is for external review of an experimental or investigational treatment adverse determination, insurance division staff shall also consider whether:

A. **coverage;** the recommended health care service:

(1) reasonably appears to be a covered benefit under the grievant's health benefit plan except for the health care insurer's determination that

_____

[6]The definition set forth in 13.10.17.7(L) NMAC (5/15/2012) was not modified under the 2016 revision to the Code. It has been renumbered as 13.10.17.7(N) NMAC.

13

the health care service is experimental or investigational for a particular medical condition; and

(2) is not explicitly listed as an excluded benefit under the grievant's health benefit plan; and

B. **medical necessity;** the grievant's treating provider has certified that:

(1) standard health care services have not been effective in improving the grievant's condition; or

(2) standard health care services are not medically appropriate for the grievant; or

(3) there is no standard health care service covered by the health care insurer that is as beneficial or more beneficial than the health care service[.]

13.10.17.28 NMAC (5/15/2012).[7]

{20}   Having reviewed the entire administrative record, the Superintendent specifically concluded that the "HBOT treatment denied by Presbyterian does not meet the

---

[7]The 2016 revision to the Code renumbered 13.10.17.28 NMAC (5/15/2012) as 13.10.17.29 NMAC. Substantive changes to the language of 13.10.17.28 include the substitution of "an IRO" for "insurance division staff," and identification of the health care treatment sought as both "recommended or requested." *See* 13.10.17.29 NMAC. As used in 13.10.17.29 NMAC, "IRO" refers to "[i]ndependent review organization," which are entities under the revised Code that can be assigned to conduct the independent review. *See* 13.10.17.23 NMAC. Also under the 2016 revision to the Code, external review of a decision by an IRO is binding upon both the grievant and the health care insurer unless a grievant has and exercises a right of appeal under the Patient Protection Act, NMSA 1978, § 59A-57-1 to -11 (1998, as amended through 2003). *See* 13.10.17.30(A) NMAC.

14

requirements necessary to establish medical necessity[,]" then cited a non-existent provision of the Code: "13.10.17(B) [NMAC (5/15/2012)]." In reversing the Superintendent, the district court relied on 13.10.17.28(B) NMAC (5/15/2012). To determine whether the district court's reversal of the Superintendent was correct, we must determine the applicable definition in this circumstance.

{21}   "[A] court's interpretation of an administrative regulation is a question of law that we review de novo." *Truong v. Allstate Ins. Co.*, 2010-NMSC-009, ¶ 24, 147 N.M. 583, 227 P.3d 73 (internal quotation marks and citation omitted). "In interpreting sections of the . . . Code, we apply the same rules as used in statutory interpretation." *Alliance Health of Santa Teresa, Inc. v. Nat'l Presto Indus.*, 2007-NMCA-157, ¶ 18, 143 N.M. 133, 173 P.3d 55. "We look first to the plain language of the [regulation], giving the words their ordinary meaning," unless there is an indication that "a different [meaning] was intended." *N.M. Indus. Energy Consumers v. N.M. Pub. Regulation Comm'n*, 2007-NMSC-053, ¶ 20, 142 N.M. 533, 168 P.3d 105. "When [a regulation's] language is clear and unambiguous, this Court must give effect to that language and refrain from further . . . interpretation." *Marbob Energy Corp. v. N.M. Oil Conservation Comm'n*, 2009-NMSC-013, ¶ 9, 146 N.M. 24, 206 P.3d 135 (alteration, internal quotation marks, and citation omitted).

**A.    13.10.17.28(B) NMAC (5/15/2012) Does Not Provide the Applicable**

**Definition of Medical Necessity Under the Code**

{22} The Code details the requirements, time frames, and considerations pertinent to the filing and review of an adverse determination grievance. *See* 13.10.17.1 to -.40 NMAC (05/03/2004, as amended through 05/15/2012). Its provisions are organized beginning with general requirements, then preliminary determinations, initial determinations, internal review, and finally external review. *Id.* For example, 13.10.17.6 NMAC (5/15/2012) establishes "procedures for filing and processing adverse determination grievances and administrative grievances regarding actions taken or inaction by a health care insurer." More specifically, 13.10.17.27 NMAC (5/15/2012) details the "[c]riteria for initial external review of adverse determination by insurance division staff[,]" setting out factors that staff must consider in deciding which grievances are available for review by the Superintendent. 13.10.17.28 NMAC (5/15/2012) denotes supplemental considerations in the context of external review of experimental or investigational treatments, as indicated by the phrase "shall also consider" in the first sentence of the provision. Regarding medical necessity, what "shall also" be considered is the required certification of medical necessity by a "licensed, board certified or board eligible physician qualified to practice in the area of medicine appropriate to treat the grievant's condition[.]" 13.10.17.28(B)(3)(b) NMAC (5/15/2012). The language "shall also" and the fact that the section regarding

16

medical necessity does not supply an independent definition, but states the requirements for supplemental certification in the context of experimental or investigational treatment adverse determinations, is the first indication that 13.10.17.28(B) NMAC (5/15/2012) does not replace 13.10.17.7(L) NMAC (5/15/2012)'s definition of "medical necessity."

{23} 13.10.17.29(B) NMAC (5/15/2012) next details the procedure applicable "[i]f the request for external review does not meet the criteria prescribed by 13.10.17.27 [NMAC (5/15/2012)] and, if applicable, 13.10.17.28 NMAC [(5/15/2012)]." However, if the "request meets the criteria for external review," the Superintendent notifies the insurer and the grievant that an informal hearing "has been set to determine whether, as a result of the health care insurer's adverse determination, the grievant was deprived of medically necessary covered services." 13.10.17.29(C) NMAC (5/15/2012). The "additional criteria" under 13.10.17.28 NMAC is plainly denoted as something that "shall also" be considered upon a grievant's request for external review involving experimental or investigational treatment. *Id*.

{24} Our review of 13.10.17.27 through -.29 NMAC (5/15/2012) suggests that the criteria listed under the "medical necessity" provision of 13.10.17.28(B) NMAC (5/15/2012) merely states applicable "criteria for initial external review" of the medical necessity of experimental or investigational treatment, rather than supplying an

17

independent and superseding definition of "medical necessity" for purposes of determining whether a treatment is covered by the plan or medically necessary under the Code. *See* 13.10.17.29 NMAC (5/15/2012); *see also State v. Ybarra*, 2010-NMCA-063, ¶ 7, 148 N.M. 373, 237 P.3d 117 ("There is no difference between our review of the Administrative Code and statutes, and we determine and effectuate the intention of the administrative agency using the plain language of the regulation as the primary indicator of its intent."). We see no indication that the "criteria for initial external review," utilized in order to determine whether a grievant's request for external review is to occur as "prescribed by 13.10.17.27 [NMAC (5/15/2012)] and, if applicable, 13.10.17.28 [NMAC (5/15/2012)]" was also intended to substitute or replace the general definition of "medical necessity" for purposes of the Superintendent's hearing. *See* 13.10.17.29(B) NMAC (5/15/2012); *see also* 13.10.17.29(C) NMAC (5/15/2012) (explaining role of 13.10.17.28 NMAC (5/15/2012) in determining whether a request meets the criteria for external review prior to the setting of an informal hearing); *see also Alliance Health of Santa Teresa, Inc.*, 2007-NMCA-157, ¶ 24 (stating that we generally do not read language into the Code).

**{25}** In the dissenting portion of Chief Judge Vigil's separate opinion, he reasons that, in the "case of an experimental or investigational treatment, the definition of 'medical necessity' [under 13.10.17.28(B) NMAC (5/15/2012)] governs instead of the

general definition" under 13.10.17.7(L) NMAC (5/15/2012). (Vigil, C.J., dissenting in part, and specially concurring, ¶ 40). But this perspective essentially revises the Code's regulatory language. That the criteria for medical necessity under 13.10.17.28(B) NMAC (5/15/2012) is meant to supplement, and not replace, 13.10.17.7(L) NMAC (5/15/2012) is made most plain by use of the prefatory directive "shall also consider." 13.10.17.28 NMAC (5/15/2012). Otherwise, the language would read "shall consider instead." But it does not. We likewise consider Chief Judge Vigil's statement that a patient can "never win when coverage is sought for an experimental or investigational treatment," (Vigil, C.J., dissenting in part, and specially concurring, ¶ 39), to be mistaken. Such a grievant must, however, establish medical necessity by the same standard required of any grievant under the Code, that being the general standard under 13.10.17.7(L) NMAC (5/15/12). Additionally, in order to gain the opportunity for a hearing before the Superintendent, such a grievant must first attain a treating provider's separate and compliant certification of medical necessity with the added strictures associated with the experimental or investigational treatment sought. *See* 13.10.17.28(B) NMAC (5/15/12).

{26}    Indeed, it would make little sense that a treating provider's contention could alone establish medical necessity under the Code despite the existence of an otherwise comprehensively applicable definition that both applies objective criteria and directly

19

incorporates a health care provider's independent assessment of those "health care services . . . appropriate or necessary, according to generally accepted principles and practices of good medical care[.]" 13.10.17.7(L) NMAC (5/15/2012). We view 13.10.17.28(B) NMAC (5/15/2012) and 13.10.17.28(B) NMAC (5/15/2012) to not be mutually exclusive. Accordingly, we conclude that the district court misinterpreted 13.10.17.28(B) NMAC (5/15/2012) and thereby misapplied the definition of "medical necessity" under the Code. While we recognize that the Superintendent likewise appeared to rely primarily upon 13.10.17.28(B) NMAC (5/15/2012) as the determinant of "medical necessity," and we generally defer to an agency's interpretation of its own regulation, "we are not bound by the agency's interpretation and we may substitute our own independent judgment for that of the agency if the agency's interpretation is unreasonable or unlawful." *Albuquerque Bernalillo Cty. Water Util. Auth. v. N.M. Pub. Regulation Comm'n*, 2010-NMSC-013, ¶ 51, 148 N.M. 21, 229 P.3d 494 (alteration, internal quotation marks, and citation omitted). To the extent the Superintendent's use of 13.10.17.28 NMAC (5/15/2012) was mistaken, we are not bound by it or the district court's ensuing error applying the same provision. *See Albuquerque Bernalillo Cty. Water Util. Auth.*, 2010-NMSC-013, ¶ 51.

**B.     13.10.17.7(L) NMAC (5/15/2012) Provides the Applicable Definition of Medical Necessity Under the Code**

20

{27}    13.10.17.7 NMAC (5/15/2012), the applicable definitional section, announces that "[a]s used in this rule[,]" the meaning of "medical necessity" or "medically necessary" is established by 13.10.17.7(L) NMAC (5/15/2012). Consistent with the Superintendent's authority, we view this generally applicable definition to be that which should have been applied by the Superintendent to review whether Presbyterian's adverse determination regarding coverage of HBOT deprived Jessica of "medically necessary covered services." *See* 13.10.17.29(C) NMAC (5/15/2012); *State ex rel. Helman v. Gallegos*, 1994-NMSC-023, ¶ 22, 117 N.M. 346, 871 P.2d 1352 (stating that when "the meaning of a statute is truly clear—not vague, uncertain, ambiguous, or otherwise doubtful—it is of course the responsibility of the judiciary to apply the statute as written"). The regulation promulgated by the Superintendent reveals the purpose of the external review hearing: "to determine whether, as a result of the health care insurer's adverse determination, the grievant was deprived of medically necessary covered services." 13.10.17.29(C) NMAC (5/15/2012). To this end, the Code pointedly defines "medical necessity" or "medically necessary" under 13.10.17.7(L) NMAC (5/15/2012). These rules and regulations govern insurers like Presbyterian. *See* 13.10.17.2(A) NMAC (5/15/2012). Thus, for the purposes of determining whether HBOT was "medically necessary" in Jessica's circumstances, the Superintendent is constrained by definitional rules it is statutorily empowered to promulgate, one being

13.10.17.7(L) NMAC (5/15/2012). It is this provision to which Presbyterian's contract and coverage must adhere, even in circumstances where the Code provides additionally applicable criteria, such as the requisite certification of medical necessity set forth by 13.10.17.28(B) NMAC (5/15/2012) in the context of "initial external review of experimental or investigational treatment adverse determinations[.]"

## III. The District Court's Reversal of the Superintendent Was Erroneous

{28} While we have held that the district court improperly concluded that HBOT was a "covered benefit" pursuant to her insurance contract, and improperly applied 13.10.17.28(B) NMAC as the definition of "medical necessity," we must yet determine whether Presbyterian's denial of coverage withstands Rodarte's challenge under 13.10.17.7(L).[8] *See Marckstadt v. Lockheed Martin Corp.*, 2010-NMSC-001, ¶ 18, 147 N.M. 678, 228 P.3d 462 (holding in the context of vehicle insurance that parties' freedom to contract does not excuse them from "the necessity of meeting [applicable] statutory and regulatory requirements"). If the denial of coverage to Jessica was proper under 13.10.17.7(L) NMAC (5/15/2012) as well as the contract, then the

---

[8]We recognize that Presbyterian seeks to prevail based solely upon the language of the contract into which it and Rodarte entered, but we observe no substantive difference, nor does Presbyterian argue one exists, between 13.10.17.7(L) NMAC (5/15/2012) and the insurance contract's own definition. As we have stated, the health plan contract must conform to applicable provisions of the Code. *See* 13.10.13.8(C)(1) NMAC (requiring "that a covered person shall have the right, at a minimum . . . to available and accessible services when medically necessary").

22

Superintendent will have reached the proper result and the district court will have erred in reversing the Superintendent. If, to the contrary, the denial of coverage to Jessica was improper under 13.10.17.7(L) (5/15/2012), the district court's reversal could be correct on grounds not relied on by it. *See Meiboom v. Watson*, 2000-NMSC-004, ¶ 20, 128 N.M. 536, 994 P.2d 1154 (stating that an appellate court may affirm a trial court's ruling on a ground that was not relied on below if reliance on the new ground would not be unfair to the appellant). We may not "set aside, reverse[,] or remand the final decision" of the Superintendent without a determination that it acted fraudulently, arbitrarily or capriciously, its final decision was not supported by substantial evidence, or was not in accordance with law. Section 39-3-1.1(D). Neither party contends, nor does our review of the record indicate, that the Superintendent acted fraudulently, arbitrarily, or capriciously.

{29} To ascertain whether substantial evidence supported the Superintendent's final decision upholding Presbyterian's coverage denial, we look to the record. We note that the Superintendent's internal review panel first determined that there was a lack of evidence that HBOT improved Jessica's condition. First, it observed that Jessica's pre-screening exam was conducted four months prior to the first application of HBOT and was therefore "not an appropriate objective scientific tool for measuring the effect of HBOT." As well, it concluded that the case studies presented to the panel by Dr.

23

Stoller were not comparable to "high level research studies[,] such as those done in a prospective, randomized, controlled, double-blinded fashion." It also pointed to the absence of evidence establishing a causal linkage between Jessica's "alleged improvements" and HBOT treatment, and a study provided by Dr. Stoller that noted the inability to gauge the efficacy of HBOT when utilized within a year of a traumatic brain injury. We conclude this to be "relevant evidence that a reasonable mind would find adequate to support a conclusion[,]" required for a determination of the existence of substantial evidence. *Ponder*, 2000-NMSC-033, ¶ 7 (internal quotation marks and citation omitted). Under 13.10.17.7(L) NMAC (5/15/2012), substantial evidence supported the determination that Rodarte failed to establish the medical necessity of HBOT to treat Jessica's anoxic brain injury.

{30}     Regarding whether the Superintendent acted in conformance with law, we recognize that the erroneous application of 13.10.17.28(B) NMAC (5/15/2012) to the substantive question of medical necessity in this instance can alone serve as the basis to reverse the administrative determination. Here we cannot tell with certainty which provision the Superintendent utilized because he cited a non-existent provision within the Code. We can, however, nonetheless determine that the Superintendent's ultimate determination that the treatment was not medically necessary should have been affirmed by application of 13.10.17.7(L) NMAC (05/15/2012). *See Cordova v. World*

*Fin. Corp. of N.M.*, 2009-NMSC-021, ¶ 18, 146 N.M. 256, 208 P.3d 901 (stating that appellate courts may affirm a lower court if it is right for any reason, "so long as the circumstances do not make it unfair to the appellant to affirm"); *see also Martinez v. N.M. State Eng'r Office*, 2000-NMCA-074, ¶ 21, 129 N.M. 413, 9 P.3d 657 (upholding the decision of an administrative law judge on the basis of right for any reason). Because there is substantial evidence to support the Superintendent's determination, we may also conclude that it did not act fraudulently, arbitrarily, or capriciously. Lastly, because Presbyterian consistently sought enforcement of its contract by repeated reference to the correct governing standard for medical necessity, as set forth within 13.10.17.7(L) NMAC (5/15/2012), we find no unfairness in our conclusion agreeing, albeit on somewhat different grounds, with the result reached by the Superintendent.

**CONCLUSION**

{31}     For the foregoing reasons, we reverse the judgment of the district court and reinstate the final order of the Superintendent upholding Presbyterian's denial of coverage.

{32}     **IT IS SO ORDERED.**

_____
                                **J. MILES HANISEE, Judge**

25

**I CONCUR:**

_____

**LINDA M. VANZI, Judge**

**VIGIL, Chief Judge (dissenting in part, and specially concurring).**

**VIGIL, Chief Judge (dissenting in part, and specially concurring).**

{33}   I dissent in part, and specially concur in the majority opinion for the reasons set forth below.

**DISSENT**

{34}   The Code requires all health benefits plans in New Mexico to provide for medically necessary services. 13.10.17.29(C) NMAC (5/12/2012). However, HBOT treatments which Rodarte seeks to treat Jessica's condition are without question experimental or investigational. As such, they are not "medically necessary" under Presbyterian's plan[9] and they do not satisfy the Code's general definition of "medical necessity" set forth in 13.10.17.7(L) NMAC (5/12/2012).[10] That is to say, until a

---

[9]Presbyterian's insurance contract defines "medical necessity" to be: "appropriate or necessary services as determined by a Provider/Practitioner, in consultation with Presbyterian . . . which are provided to a Member for any *covered* condition requiring, according to generally accepted principles of good medical practice guidelines developed by the federal government, national or professional medical societies, boards, and associations, or any applicable clinical protocols or practice guidelines developed by [Presbyterian] consistent with such federal, national and professional practice guidelines for the diagnosis or direct care and treatment of an illness, injury, or medical condition, and are not services provided only as a convenience."

[10]Unless otherwise indicated , all future references shall be to the 2012 version, and for ease of reference shall be referred to as "Section .7(L)." Section .7(L) defines "medical necessity or medically necessary" as: "health care services determined by a provider, in consultation with the health care insurer, to be appropriate or necessary,

28

treatment has been vetted and adopted as the standard of care by the federal government or national or professional medical practice guidelines, the treatment is not "medically necessary" under Presbyterian's plan and the Code's general provision.

{35} However, the Code also recognizes that in particular cases an experimental or investigational treatment may be medically necessary for a particular patient such as Jessica. For these cases, the Code expands the classes of treatments that may be required and sets forth the parameters in which an experiment or investigational treatment may be medically necessary. This is 13.10.17.28 NMAC (5/12/2012).[11]

according to any applicable generally accepted principles and practices of good medical care or practice guidelines developed by the federal government, national or professional medical societies, boards and associations, or any applicable clinical protocols or practice guidelines developed by the health care insurer consistent with such federal, national, and professional practice guidelines, for the diagnosis or direct care and treatment of a physical, behavioral, or mental health condition, illness, injury, or disease[.]"

[11]Unless otherwise indicated, all future references shall be to the 2012 version, and for ease of reference shall be referred to as "Section .28." In its entirety Section .28 provides:
    A.    **coverage**; the recommended or requested health care service:
    (1)    reasonably appears to be a covered benefit under the grievant's health benefit plan except for the health care insurer's determination that the health care service is experimental or investigational for a particular medical condition; and
    (2)    is not explicitly listed as an excluded benefit under the grievant's health benefit plan; and
    B.    **medical necessity**; the grievant's treating provider has certified that:
    (1)    standard health care services have not been effective in improving the grievant's condition; or

The majority concludes that Section .28 serves only a gatekeeper function by "merely" setting forth criteria to consider in determining whether to grant administrative review when a provider has denied coverage for an experimental or investigational treatment. Majority Op. ¶ 24. The majority then determines that an experimental or investigational treatment must fulfill an impossibility, which is to satisfy the Code's general definition of "medical necessity" in Section .7(L), Majority Op. ¶ 25, and after weighing the evidence itself, concludes that the HBOT treatments are not "medically necessary" under Section .7(L). Majority Op. ¶ 27. I dissent from these conclusions.

{36} Presbyterian denied coverage on the grounds there is no coverage for Jessica's condition and because the treatment was for "experimental or investigational services [or] treatments." Rodarte sought administrative review of the denial, and the

---

(2) standard health care services are not medically appropriate for the grievant; or

(3) there is no standard health care service covered by the health care insurer that is as beneficial or more beneficial than the health care service:

(a) recommended by the grievant's treating provider that the treating provider certifies in writing is likely to be more beneficial to the grievant, in the treating provider's opinion, than standard health care services; or

(b) requested by the grievant regarding which the grievant's treating provider, who is a licensed, board certified or board eligible physician qualified to practice in the area of medicine appropriate to treat the grievant's condition, has certified in writing that scientifically valid studies using accepted protocols demonstrate that the health care service requested by the grievant is likely to be more beneficial to the grievant than available standard health care services.

Superintendent granted review under Section .28. The hearing panel appointed by the Superintendent, took evidence and made a recommended decision. It considered whether Jessica's proposed treatment satisfied the criteria of Section .28, and concluded that it does not. The hearing panel therefore recommended upholding Presbyterian's denial of HBOT treatments under Section .28.

{37} The Superintendent upheld the hearing panel's recommended decision to deny coverage. The Superintendent first stated that the issue presented in the administrative hearing under 13.10.17.29(C) NMAC (5/12/2012) was whether Jessica was deprived of "medically necessary covered services." Thus, ruled the Superintendent, the services must be "medically necessary" before Presbyterian's adverse determination could be reversed. Pertinent to the issue before us, the Superintendent specifically ruled, "Although not expressly stated in the regulations, it is reasonable to infer that, when a treatment is denied because it is deemed to be experimental or investigational, the standard for medical necessity set forth in [Section .28(B)], and relied on by the [p]anel, should be applied to the evidence in the record." The Superintendent then specifically ruled that the HBOT treatment denied by Presbyterian "does not meet the requirements necessary to establish medical necessity[.]" The Superintendent also added, "pursuant to 13.10.17.B NMAC" which, as the majority opinion points out,

31

does not exist. In my view this error is inconsequential, as the Superintendent and hearing panel are both clear that they were applying the standard of medical necessity under Section .28(B) in upholding Presbyterian's denial. (I infer a typographical error in typing "13.10.**17.B**" instead of "13.10.17.**28(B)**").

{38} Rodarte then appealed to the district court, specifically arguing that the HBOT treatment was "medically necessary" under Section .28(B). As the majority points out, the district court ultimately considered whether the treatment satisfied the requirement of "medical necessity" in Section .28. Majority Op. ¶ 9. In its ruling, the district court ruled that "the proper standard for the ultimate agency review of the medical necessity of an experimental or investigational medical procedure is . . . [Section .28(B)]," and that the specific standard in Section .28(B) applies, rather than the more general definition of "medical necessity" found at Section .7(L). It is from this order that Presbyterian appeals.

{39} Presbyterian, the hearing panel appointed by the Superintendent, the Superintendent, and the district court all concluded that the standard of "medical necessity" under Section .28(B) applies. Disagreeing, the majority holds that it is nothing more than something which must be considered in determining whether to grant administrative review. Majority Op. ¶ 24. Where the majority's reasoning fails,

32

however, is that it results in granting an administrative hearing which a patient can never win when coverage is sought for an experimental or investigational treatment, because such a treatment will never satisfy Section .7(L). As Rodarte points out, "[w]hat would be the point of permitting appeals that could never, by definition, succeed?" The answer is that the Code does not provide for a meaningless hearing. Instead, as the Superintendent ruled, when a treatment is denied because it is deemed to be experimental or investigational, the standard of medical necessity in Section .28(B) governs.

{40} Administrative regulations are to be interpreted under the same basic principles that guide interpretation of statutes. *See PC Carter Co. v. Miller*, 2011-NMCA-052, ¶ 11, 149 N.M. 660, 253 P.3d 950. As such, "each section or part should be construed in connection with every other part or section, giving effect to each, and each provision is to be reconciled in a manner that is consistent and sensible so as to produce a harmonious whole." *Lion's Gate Water v. D'Antonio*, 2009-NMSC-057, ¶ 23, 147, N.M. 523, 226 P.3d 622 (internal quotation marks and citation omitted). Moreover, "The general/specific rule provides that when two statutes deal with the same subject matter, the statute dealing with a specific subject will be considered an exception to, and given effect over, the more general statute." *Lu v. Educ. Trust Bd.*

33

*of N.M.*, 2013-NMCA-010, ¶ 13, 293 P.3d 186 (alteration, internal quotation marks, and citation omitted). Finally, a regulation should be interpreted with common sense, and an interpretation that leads to absurdity or contradiction should be avoided. *See Baker v. Hedstrom*, 2013-NMSC-043, ¶ 36, 309 P.3d 1047. Application of these settled principles requires that, in the case of an experimental or investigational treatment, the definition of "medical necessity" in Section .28 governs instead of the general definition of "medical necessity" in Section .7(L). Since the majority disagrees, I dissent. I therefore agree with the hearing panel, the Superintendent, and the district court that Section .28 governs administrative review when treatment has been denied on the basis that it is experimental or investigational.

**SPECIAL CONCURRENCE**

{41}    The foregoing dissent notwithstanding, I agree with the majority that the order of the district court must be reversed. However, I arrive at this conclusion under Section .28.

{42}    Under subsection (A) of Section.28, it must be considered: (1) whether HBOT reasonably appears to be a covered benefit under Presbyterian's plan, except for Presbyterian's determination that HBOT is experimental or investigational; and (2) HBOT is not explicitly listed as an exclusion under Presbyterian's plan. Part I of the

34

majority opinion in ¶¶ 12-16 demonstrates that Presbyterian's insurance contract does not provide coverage for Jessica's medical condition. I fully concur in this portion of the majority opinion. Moreover, this part of the majority opinion also demonstrates that the HBOT treatments are not only not specifically covered under Presbyterian's health plan, they are specifically excluded. I therefore conclude that Rodarte failed to prove that subsection (A) of Section .28 was satisfied.

{43} I next consider whether subsection (B) of Section .28 was satisfied. The issue presented to the hearing panel was whether the HBOT treatments were "medically necessary" under Section .28(B)(3)(b).

{44} In seeking to prove such "medical necessity" Jessica's treating physician, Dr. Ken Stoller certified that there is no standard health care service covered by Presbyterian that is as beneficial or more beneficial than the proposed HBOT treatments. The hearing panel noted, however, that "the issue is a lack of high level research studies such as those done in a prospective, randomized, controlled, double-blinded fashion. Dr. Stoller presented several case studies in his materials, but case studies are not a substitute [for] the types of studies just described in the medical field." After noting Jessica's treatments by Dr. Stoller, and Jessica's response to those treatments, the hearing panel concluded, "Due to the lack of evidence that HBOT

35

caused Ms. Rodarte's alleged improvements and the fact that she was provided HBOT treatment within the first year following her diagnosis of anoxic encephalopathy when spontaneous improvement can occur, it is not clear that HBOT caused Ms. Rodarte's improvements." Based on its review of the evidence, the hearing panel concluded that the evidence failed to demonstrate that the HBOT treatments were medically necessary under Section .28(B). The Superintendent in turn adopted, approved, and accepted the hearing panel's recommendation.

{45}    I conclude that substantial evidence supports the Superintendent's conclusion that the HBOT treatments were not medically necessary under Section .28(B). I therefore agree with the majority that the district court erred. However, I disagree with the majority that independently examining the evidence to determine whether it satisfies section .7(L) is necessary or appropriate. *See* Majority Op. ¶¶ 26-28.

{46}    I therefore specially concur in the result reached.

_____

**MICHAEL E. VIGIL, Chief Judge**

36